# CASES DETERMINED

BY THE

# SUPREME COURT

OF THE

## STATE OF MISSOURI

AT THE

APRIL TERM, 1899.

*(Continued from Volume 151.)*

THE STATE ex inf. CROW, Attorney-General, v. FIREMEN'S FUND INSURANCE COMPANY et al.

In Banc, July 15, 1899.

1. **Insurance Trust: COMBINATION TO FIX RATES FOR FIRE INSURANCE, ETC.** The statute provides that "any corporation organized under the laws of this or any other State or county for transacting or conducting any kind of business in this State, . . . which shall enter into . . . any pool, trust, agreement, confederation or understanding with any other corporation, . . . person or association of persons, to regulate or fix . . . the price or premium to be paid for insuring property against loss or damage by fire,

*lightning* or storm, or to maintain said price when so regulated and fixed, or shall enter into, become a member of or party to any pool, agreement, contract, combination or confederation to fix or limit . . . the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, shall be deemed and adjudged guilty of a conspiracy to defraud, and be subject to penalties as provided in this act." It was shown that prior to the enactment of this statute, the Association of Fire Underwriters of Missouri was maintained for the purpose of establishing and maintaining rates at which property in the State was insured, and one Fetter of Kansas City was employed to fix such rates and see they were maintained. After the statute was enacted, this association realized its practices were violative thereof, and ceased to exist, and Fetter on his own account published a book of rates which were the same as those previously fixed and maintained by the association. This book he sold to the defendant insurance companies, and all their local agents at St. Joseph had it, and all policies in that town were written according to the rates therein, and when there was a variance the general agent was, at the first, notified by a slip attached to the daily report turned over by the local agent to the secretary of a club, composed of the local agents of all the defendant companies except five, but later when it was deemed "inexpedient" to commit such matters to writing, the local agent was verbally notified by the secretary, and if he did not conform his policy to the Fetter rates he was called to account. The club had no constitution or by-laws and its president testified that it would put nothing to writing that would lay its members liable to prosecution, and that what was done towards maintaining rates was "understood" by the members. The daily report to the secretary included the policies written by the agent during the day, inclosed in an envelope addressed to the companies, and this the secretary after examining the policies, sealed and mailed to the company. The secretary was recommended by Fetter and had formerly been employed in his business, and the local agents contributed one dollar per month for each company towards his support, which was usually held back by the agents in their monthly remittances to the companies, and Fetter was paid by the companies for his books by charging a per cent on the entire business done by each company in the State. *Held,* that the club is a plain, palpable but bungling pool, trust, agreement, combination, confederation and understanding organized to evade said anti-trust statute. *Held,* also, that the knowledge of the local agents who composed the club, is the knowledge of the companies, and their acts are the acts of their companies. *Held,* also, that the companies be ousted of all the rights, privileges and franchises conferred by the laws of this State and of their licenses to do business in this State.

*Held,* also, that, although five of the defendant companies were not members of the local club, yet as they have made common cause with the other defendants by the pleadings and their joint answer, the judgment of ouster will include them, too.

*Held,* by GANTT, C. J., that the five companies against whom the evidence failed to establish the charges, could not be held to have admitted the allegations of the petition because they joined in the answer denying the constitutionality of the statute.

*Held,* by VALLIANT, J., in a separate opinion, that the evidence is not sufficient to convict any of the defendants of the offense charged.

2. ———: ———ACTS OF AGENTS. If the acts and practices of agents of corporations are in violation of law, the companies must suffer therefor. The company must control its agents, and see to it that they do not violate the law while attending to the business of the company.

3. **Pleading**; ADMISSIONS: GENERAL DENIAL. The closing of the answer with a general denial of all the allegations of the petition not admitted therein to be true, avails nothing if the specific defenses pleaded are all predicated upon the facts charged being true.

4. **Trust**: OCCASIONAL VIOLATIONS OF TRUST AGREEMENTS. The fact that certain parties to a trust were treacherous to each other, and in their desire to do business violated the trust agreement and occasionally wrote policies for less than the fixed rate, does not tend to disprove the existence of the trust.

5. ———: EVIDENCE OF EXISTENCE. The existence of a trust may be as conclusively proved by facts and circumstances as by direct, written evidence.

6. ———: DEFFINITION. A trust is a contract, combination, confederation or understanding, express or implied, between two or more persons, to control the price of a commodity or service, for the benefit of the parties thereto, and to the injury of the public, and which tends to create a monopoly. There is no difference in principle in contracts in restraint of trade and trusts. The difference is in extent and methods.

7. ———: INTENTION OF MEMBERS. If the practice of the members of a club composed of local insurance agents had the effect of maintaining fixed rates of insurance, it constituted them a trust, no matter whether the members intended it to have that effect or not.

8.   **Statute: TITLE: CONSTITUTIONAL.** The title of the anti-trust law of 1891, and the amendments thereto in 1895 and 1897, does not infringe on the constitutional provision that "no bill shall contain more than one subject, which shall be clearly expressed in its title." The subject of insurance against loss or damage by fire, lightning or storm is not a different subject from that contained in the title, which is, "An Act providing for the punishment of pools, trusts and conspiracies to control prices, and as to evidence and prosecution in such cases."

9.   ————: FREEDOM OF CONTRACTS: CONSTITUTION: DUE PROCESS OF LAW. Said statute is not unconstitutional. It is not true that it "deprives insurance companies of their property, life or liberty without due process of law" on the theory that "it renders it unlawful for insurance companies to contract among themselves for the reasonable adjustment and maintenance of insurance rates." It permits any company to contract with any person who desires to insure his property upon any terms that they may agree upon. It does prohibit one company from agreeing with any other company *not to contract* with such person except upon terms which the confederating companies have previously fixed. The statute refuses to permit a company to strip itself of the power freely to contract. It guarantees to both insurance company and insured the free, unrestricted power to lawfully contract. It does not infringe upon the liberty of the citizen to contract concerning his property and prohibit him the enjoyment of his property and impose restraints and burdens upon it without due process of law.

10.   ————: ————: UNRESTRAINED. There is no such thing in civilized society as the unrestrained power to contract.

11.   ————: DISCRIMINATION BETWEEN HOME AND FOREIGN COMPANIES. Said act does not discriminate between foreign and domestic insurance companies, but expressly applies to all alike.

12.   ————: VESTED RIGHTS UNDER POLICE REGULATIONS. Nor as to foreign insurance companies doing business in this State when the law was enacted, does it violate that part of the U. S. Constitution that "no State shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law," as no person acquires any vested rights by complying with existing police regulations or comity laws which can not be affected by subsequent changes in such regulations or laws.

*Quo Warranto.*

WRIT OF OUSTER AWARDED.

EDWARD C. CROW, Attorney-General, and SAM B. JEFFRIES, Assistant Attorney-General, for informant.

(1.) The anti-trust statute of Missouri does not infringe upon the liberty of the citizen to contract concerning his property and prohibit him the enjoyment of his property and impose restraints and burdens upon it without due process of law. Road Co. v. Sanford, 164 U. S. 592; Waters-Pierce Oil Co. v. State, 44 H. R. W. R. 938; U. S. v. Joint Traffic Ass'n, 171 U. S. 505. These statutes are founded upon a proper exercise of the general police authority of the State. Beach on Trusts and Monopolies, sec. 13; Munn v. Illinois, 94 U. S. 124; Railroad v. Beckwith, 129 U. S. 29; State v. Moore, 104 N. C. 710; Thorp v. Railroad, 27 Vt. 140; Bertholf v. O'Rielly, 74 N. Y. 521. The State, in the exercise of this power in the selection of remedies looking to the suppression of evil and harm to its people, may apply them to the most sacred contracts and to the uses of property of every description, not in the way of an arbitrary spoliation or confiscation in the capricious exercise of the police power, but a useful regulation in the interest of the public welfare. Cooley's Const. Lim. (6 Ed.), pp. 707-720. In enumerating subjects which are acted upon by the State in the exercise of its police power, a late writer on limitations of police powers names combinations in restraint of trade. In U. S. v. Trans-Missouri Freight Ass'n, 166 U. S. 322, the court said: "While the statute prohibits all combinations in the form of trusts or otherwise, the limitation is not confined to that form alone. All combinations which are in restraint of trade or commerce are prohibited, whether in the form of trusts or in any other form whatever." Tiedeman on Lims. of Police Powers, sec. 96a; Railroad v. Mathews, 165 U. S. 16; Crowley v. Christenson, 137 U. S. 89. The Federal Supreme Court has decided that it was not the design of the Fourteenth Amendment to the Constitution of the United States to interfere with the just and

proper exercise of the police power by the States.   Barbier v.
Connolly, 113 U. S. 31; Davis v. Mass, 167 U. S. 47; Oil Co.
v. State, 44 S. W. Rep. 938.   (2)   If legislative authority
does exist to restrain the conduct of owners of property in a
particular way in the use of their property so as to work injury
to the public welfare, and the legislature has acted in the man-
ner required by the Constitution in passing laws, then due pro-
cess of law exists in so far as it is necessary to find legal au-
thority for passing a statute similar to our anti-trust act, pro-
hibiting all combinations in restraint of trade.   Legal restraint
imposed upon the use of property does not deprive the owner of
it of due process of law.   Railroad v. Mathews, 165 U. S. 23;
Railroad v. Hume, 115 U. S. 519; Barbier v. Connelly, 113
U. S. 31; Walston v. Nevin, 128 U. S. 582; Railroad v. Gib-
bes, 142 U. S. 387; Bertholf v. O'Reilly, 74 N. Y. 519; Mulger
v. Kansas, 123 U. S. 653; Davidson v. New Orleans, 96 U. S.
104.   (3)   The anti-trust statute is not obnoxious to the Four-
teenth Amendment to the federal constitution, as being class
legislation.   U. S. v. Pipe Co., 85 Fed. Rep. 285; Association
v. Houck, 27 S. W. Rep. 696; Brewing Co. v. Templeman, 38
S. W. Rep. 27; Puqua v. Chicago Milk Shippers' Ass'n, 155
Ill. 166; U. S. v. Trans-Missouri Freight Ass'n, 166 U. S. 299;
People v. Railroad, 121 N. Y. 616; Hathaway v. State, 38
Tex. Crim. App. 261; People ex rel. v. American Tobacco
Company (1897), 2 Chicago, L. J. Weekly, p. 249; Casualty
Co. v. Alibone, 90 Tex. 660; Ins. Co. v. Levy, 33 S. W. Rep.
992; Campbell v. Cook, 86 Tex. 684; Railroad v. Mackay, 127
U. S. 209; Railroad v. Beckwith, 129 U. S. 29; Railroad v.
New York, 165 U. S. 623; Soone Hing v. Crowley, 113 U. S.
708; Bank v. Penn, 167 U. S. 462; Railroad v. Mathews, 165
U. S. 17; State v. Moore, 104 N. C. 714.   (4)   No covenant
in restraint of trade can be enforced unless the covenant em-
bodying it is merely ancillary to the main purpose of a lawful
contract and necessary to protect the covenantee in the enjoy-
ment of the legitimate fruits of the contract or to protect him
from the dangers of an unjust use of those fruits by the other

party. U. S. v. Pipe Co., Fed. Rep. 282; Frisbie v. U. S., 157 U. S. 160; Holden v. Hardy, 169 U. S. 391; Martin v. Hunter's Lessee, 1 Wheat. 304; Blair v. Ridgely, 41 Mo.63. (5) Insurance combines to fix, maintain and control rates of insurance tend to and do suppress competition and such combines violate the anti-trust statute of Missouri. Hartford Fire Ins. Co. v. Raymond, Ins. Com., 70 Mich. 485; Beechley v. Mulvihill, 70 N. W. Rep. 107; American Fire Ins. Co. v. State, 26 Ins. L. J. 861; State v. Phipps, 50 Kan. 609; People v. North River Sugar Refining Co., 121 N. Y. 582; People v. Milk Exchange, 154 N. Y. 267; People v. Chicago Gas Trust Co., 130 Ill. 268; People v. Distilling and Cattle Feeding Co., 156 Ill. 448; U. S. v. Addyston Pipe and Steel Co., 85 Fed. Rep. 271; Moore v. Bennett, 140 Ill. 69; Cooke's Trade and Labor Combinations, p. 120; Greenhood on Public Policy, pp. 854-55-56-57; 3 Ins. Law Magazine, p. 42. (6) Agreements between insurance companies to fix and maintain rates tend to the suppression of competition and constitute a strict monopoly. Lawrence v. Kidder, 10 Barb. 64; Dunlop v. Gregory, 10 N. Y. 244; Beach on Industrial Trusts, secs. 10 and 11; People v. Sugar Refining Co., 54 Hun. 354; Sandiego Water Co. v. Flume Co., 108 Cal. 549; California Steam Navigation Co. v. Wright, 6 Cal.259; U. S. Trans-Missouri Freight Ass'n, 166 U. S. 290. And monopolies are against common right. Craven v. Rodgers, 101 Mo. 243. (7) Where a corporation uses its franchises for the purpose of establishing a trust, or enters into a trust to create a monopoly and stifle competition, the State can forfeit the corporate franchise. People v. North River Sugar Refining Co., 121 N. Y. 582; People v. Milk Exchange, 145 N. Y. 267; State v. Standard Oil Co., 49 Oh. St. 137; People v. Chicago Gas Trust Co., 130 Ill. 268; People v. Distilling and Cattle Feeding Co., 156 Ill. 448. The scheme inaugurated in the city of St. Joseph was intended to and did constitute a monopoly in the fixing of insurance rates in the hands of the respondent companies because it created a common rate and abolished competition. The "Social Club" fixed

the rate of insurance and dominated the business. This created a trust. Hartford Fire Ins. Co. v. Raymond, Ins. Com., 70 Mich. 485; State v. Krebs, 64 N. C. 604; People v. Sugar Refining Co., 121 N. Y. 624; Beach on Industrial Trusts, secs. 219-220; People v. W. T. B. Co., 47 N. Y. 586; London v. Van Acker, 1 Ld. Ryan 499; E. S., etc., Co. v. People, 121 Pa. St. 154; People v. F. Co., 27 Barb. 445; Com. v. Bank, 21 Pick. 542; Railroad v. Cave Co., 113 U. S. 384; State v. Railroad, 45 Wis. 590; People v. Railroad, 27 Barb. 452; F. Co. v. Hyde Park, 97 U. S. 666; People v. North River Sugar Refining Co., 121 N. Y. 582. (8) The acts of the agents of the foreign insurance corporations, in entering into a combination to fix rates of insurance in violation of the anti-trust law, bind the corporations where reports are made to the companies and they accept the benefits of said organization. Waters-Pierce Oil Co. v. State, 44 S. W. Rep. 936; Ins. Co. v. Raymond, 70 Mich. 485; State ex rel. v. Aetna Ins. Co.,150 Mo. 113. (9) It is no answer to a combination of this kind to say that it should be permitted to exist for the reason that it has reduced the prices of insurance, even though such were true. That policy may be necessary to crush competition. Such combinations have been frequently condemned by courts as unlawful and against public policy. Hoeker v. Vandewater, 4 Denio 349; Stanton v. Allen, 5 Denio 434; Coal Co. v. Coal Co., 68 Pa. St. 186; Craft v. McConoughy, 79 Ill. 346; Hannah v. Fife, 27 Mich. 172; Alger v. Thatcher, 19 Pick. 51. In numerous cases restrictions have been condemned, notwithstanding they produced for a while the lowering of prices. Anderson v. Jett, 89 Ky. 375; Hoffman v. Brooks, 23 Am. L. Reg. 648; People v. Milk Exchange, 145 N. Y. 267.

GIVEN CAMPBELL and WADDILL, ELLERBE & HEREFORD for respondents.

(1) This suit is in the nature of a public accusation, and if the State makes out its case, the judgment is penal, and

in such case the burden of proof is upon the State to prove the charges as alleged. 5 Thompson's Com. on Corps., sec. 6804; State ex. inf. v. Bland, 144 Mo. 534; High ex. Remedies, sec. 710; State ex rel. v. Talbots, 123 Mo. 69; 2 Spell ex. Relief, secs. 1850, 1851, 1860. (2) The overwhelming weight of evidence establishes the fact that the Underwriters' Social Club of St. Joseph, Mo., was not created, formed or organized, conducted or carried on for the purpose of fixing or maintaining rates of insurance in that city, or for the purpose of controlling rates of insurance in any respect, and that it did not either fix, control or maintain rates of insurance according to Fetter's estimates. Anderson v. U. S., 171 U. S. 604. (3) None of the respondents authorized directed or acquiesced in the acts of their local agents, in becoming members of the Underwriters' Social Club of St. Joseph, Mo., during the period covered by this suit, and none of the defendants, were aware or informed at any time prior to the production of this suit, that said club was engaged in the business of fixing or maintaining rates of fire insurance, or in any way, charged with doing same, in the city of St. Joseph, Mo. (4) The information filed by relator, does not state facts sufficient to constitute a cause of action. State ex inf. v. Bland, 144 Mo. 534. (5) The Act approved April 2, 1891, as amended by the Acts of April 11, 1895, and March 24, 1897, is repugnant to the Constitution of the State of Missouri, for the following reasons: First. It infringes the provisions of section 28 of article IV, which provides that no bill shall contain more than one subject, which shall be clearly expressed in its title. State v. Schofield, 41 Mo. 49; St. Louis v. Teifel, 42 Mo. 578; State v. Bensinger, 76 Mo. 346; State v. Blackstone, 115 Mo. 427; State ex rel. v. County Court, 128 Mo. 427; Witzman v. Railway Co., 131 Mo. 612; State ex rel. v. Hover, 134 Mo. 10; Paul v. Virginia, 8 Wall. 168; Philadelphia Fire Ass'n v. N. Y., 119 U. S. 110; Gloucester Co. v. Russia Cement Co., 154 Mass. 92; Hooper v. California,

155 U. S. 655. Second. It violates section 30 of article II, which provides that no person shall be deprived of life, liberty or property without due process of law. State v. Loomis, 115 Mo. 316; State v. Julow, 129 Mo. 177; Cooley, Const. Lim. (6 Ed.), 481, 483. (6) That said Act, as amended, is unconstitutional, in that section 1, of said Act, is violative of section 1 of the XIVth Amendment to the Constitution of the United States, which provides that no State shall deprive any person of life, liberty or property without due process of law, nor deny any person within its jurisdiction the equal protection of the law, in this, that each of said companies having fully complied with the laws of the State, having paid the fees, made all the deposits, secured the necessary license required by law, they were each authorized to do business in this State, under the protection of the laws of the State, and that said Act deprives them of the right to carry on their business in a fair and just manner among themselves and not in any manner injurious to the public or any other person in the State, and deprives them of the right of making necessary and reasonable contracts relating to the business of insurance, and discriminates against them and in favor of other domestic and foreign fire insurance companies who are not embraced within the terms of said law. Duncan v. Missouri, 152 U. S. 377; Marchant v. Railroad, 153 U. S. 390; Barbier v. Connolly, 113 U. S. 27; Missouri v. Lewis, 101 U. S. 22. (7) Courts are extremely reluctant to adjudge a forfeiture of franchise, especially in a case of this character. Topeka v. Topeka Water Co., 49 Pac. Rep. 79; State ex rel. v. Republican, 9 Mo. App. 114; People v. Railroad, 67 Ill. 1; State ex inf. v. Lincoln Trust Co., 144 Mo. 562; High, Ex. Remedies, sec. 229; Spell, Ex. Relief, secs. 1777, 1828, 1829.

MARSHALL, J.—This is an original proceeding by *quo warranto* to oust seventy-three fire insurance companies of their corporate rights, privileges and franchises under the laws of Missouri, on account of a violation by them of the laws of

this State relating to "Pools, Trusts and Conspiracies; unlawful combinations." The defendant companies are organized under the laws of other States or foreign countries, and are doing an insurance business in Missouri by reason of and compliance with the comity laws of this State.

The petition, after stating the necessary facts as to the character and organization of the defendants and their compliance with the laws of Missouri in respect to foreign insurance companies doing business in this State, is as follows:

"That afterwards on the ———— day of November, 1896, each and all of defendant corporations unlawfully, illegally and willfully misused and abused their said franchises, rights and privileges as fire insurance companies authorized to do business under the laws of the State of Missouri, in this, to wit: That each and all of said defendant corporations having an agent and representative in the city of St. Joseph, a city of less than one hundred thousand inhabitants, did then and there, through and by means of a certain organization, known as the Underwriters' Social Club of said city (which said Underwriters' Social Club of said city was organized and has been maintained and is now maintained with the knowledge and consent, and according to the desire and wish of said defendant corporations, and for the sole purpose of the advancement of the business interests of said defendant corporations in said city of St. Joseph) create, enter into, become a member of and a party to a certain pool, trust, agreement, combination, confederation and understanding with each other and other fire insurance corporations and associations of persons to regulate, fix and control the price or premium to be paid for insuring property in St. Joseph, Buchanan county, Missouri, against loss or damage by fire, lightning and storm; and to maintain and control said price when so regulated and fixed, and to, prevent competition in said business in said city.

"That each and every one of said corporations, being so represented in said city of St. Joseph, by a local resident fire

insurance agent, legally and fully authorized by each of said several defendant corporations to act for their respective corporations in all matters relating to the insurance of property against loss or damage by fire, lightning and storm in said city, said agents, and each of them, did then and there, with the knowledge and consent and according to the wish and desire of the said respective defendant corporations, which the said agents represented, and for the sole and only purpose of advancing the business interests of said defendant corporations then and there willfully, unlawfully and knowingly did agree, confederate and combine with each other to form and organize on the ———— day of November, A. D. 1896, a certain organization whose membership was composed exclusively of local resident fire insurance agents, representatives alone of defendant corporations; and said organization was then and there perfected by the said local resident agents of defendant corporations by the election of a president, secretary, treasurer and other officials whose names, except those of the secretary and president, are to the relator unknown, but who were at said time and are now local resident fire insurance agents representing different ones of the defendant corporations; that the said organization so formed was the Underwriters' Social Club of St. Joseph, Missouri, and it was formed by said local resident agents of said defendant corporations solely for the purpose of advancing the interest of said respective defendant corporations, and for the purpose of maintaining what is known in insurance circles as "correct practices;" or in other words, for the purpose of keeping up the agreed rate on all the different classes of risks of insurance; that the said rates so agreed upon to be maintained in said city of St. Joseph were fixed by one W. J. Fetter of Kansas City, Missouri, as relator is informed and believed; that ———— Wise is president of said Underwriters' Social Club, and that Mr. E. F. Scott is secretary of said organization, and was brought from the office of Mr. Fetter in Kansas City, Missouri, as relator is informed, for the purpose of assuming the duties of secretary of said

Underwriters' Social Club of St. Joseph, Missouri; that among other things the duties of Mr. E. F. Scott were to check the daily reports of the different agents belonging to said Underwriters' Social Club and to see that the policies written by said agents were all written at the agreed rate as fixed by said W. J. Fetter, and promulgated in the rate book sent to the resident local agents of defendant corporations; that the said secretary, E. F. Scott, was and is paid a salary, and that the method of paying the same is as follows: The local resident agents of defendant corporations each proportionately contributed according to the amounts assessed against them, respective sums sufficient in the aggregate to pay the monthly salary of said E. F. Scott, as secretary of said Underwriters' Social Club of St. Joseph, Missouri; each of said resident local agents of defendant corporations deduct the amount so contributed by said respective local agents of defendant corporations to the monthly salary of E. F. Scott from the monthly remittances of said respective local resident agents to the said respective defendant corporations represented by said local resident agents, and said respective defendant corporations acquiesced in said deduction from the remittances due from their said respective local resident agents and credited said local resident agents with the amount paid by each of said agents toward the salary of said E. F. Scott.

"That said W. J. Fetter of Kansas City, Missouri, styles himself an insurance expert, and that as such insurance expert he supplies the rates to be charged on all classes of risks by fire, lightning and storm in the State of Missouri, outside of the cities of Kansas City and St. Louis; and that the defendant corporations, each and all of them, do not write any insurance on any class of risk for fire, lightning and storm insurance, except at the rate fixed and agreed upon in the city of St. Joseph by the Underwriters' Social Club of St. Joseph, which rate is obtained from a rate book coming to members of said organization in a blank envelope from Kansas City, Missouri;

that the rate so established, and at which all insurance agents against loss by fire, lightning and storm is written in the city of St. Joseph, by the local resident agent of defendant corporations is supplied said resident local agents in a rate book which comes from Kansas City, Missouri, in a blank envelope, and said Underwriters' Social Club of St. Joseph, Missouri, is organized and maintained by defendant corporations and their agents for the purpose of maintaining said rates so furnished as aforesaid; that if the resident local agent of any of said defendant corporations writes insurance against loss by fire, lightning and storm in St. Joseph, Missouri, at a rate not in accordance with that fixed in said rate book and agreed upon by the said Underwriters' Social Club of St. Joseph, Missouri, said defendant corporation in which said insurance is written instructs its local resident agent to cancel said policy or policies.

"That the general nature and object of the said combination and confederation so made as aforesaid by defendant corporations, by the means and in the manner aforesaid, in the city of St. Joseph, is, first, to fix and regulate and control the certain price and premium to be paid for insuring property against loss or damage by fire, lightning and storm in said city of St. Joseph, Missouri; and, second, to maintain the said certain price or premium when so regulated or fixed for insuring property against loss or damage by fire, lightning and storm in said city; and that the said defendant corporations through their said local resident agents in St. Joseph, Missouri, have entire control of and have monopolized to the exclusion of all others, and to the great detriment of the public, the business of writing insurance against loss or damage by fire, lightning and storm in the city of St. Joseph, Missouri, and that the purpose and intention of said defendant corporations has been and is now to unlawfully and willfully thus combine and confederate with each other to monopolize and control absolutely and prevent competition in the business of writing

insurance against losses by fire, lightning and storm in the said city of St. Joseph, Missouri, and the said defendant corporations, through said Underwriters' Social Club of St. Joseph, Missouri, and in pursuance of the object, purpose and intention of said defendant corporations have willfully and unlawfully agreed, combined and confederated with each other, and with other fire insurance companies (doing business under the insurance laws of the State of Missouri), to form an insurance trust and pool in St. Joseph, Missouri, to regulate, fix and maintain the price and premium to be charged by each of said defendant corporations for insuring the different designated classes of risks on property against loss or damage by fire, lightning and storm in St. Joseph, Missouri; and the said defendant corporations and other insurance companies acting with them, in pursuance of the said agreement, combination, confederation and trust, and through the said Underwriters' Social Club of St. Joseph, Missouri, are each of them, through their respective resident local agents, willfully and unlawfully maintaining said agreed price and premium upon the respective classes of risks on property against loss by fire, lightning and storm in St. Joseph, Missouri, and which said rate so fixed in said rate book aforesaid, and so agreed to by members of said Underwriters' Social Club of St. Joseph, Missouri, aforesaid, is the minimum rate charged in St. Joseph, Missouri, by all said defendant corporations for insuring the different designated classes of property against loss or damage by fire, lightning and storm; and that said rate aforesaid, so fixed as aforesaid, is the minimum rate the said agents of said defendant insurance companies are allowed to charge by said defendant corporations in the city of St. Joseph, Missouri.

"And by reason of the premises aforesaid, relator now charges and avers that since the ———— day of November, A. D. 1896, and up to the present time, said defendant corporations in the city of St. Joseph, Missouri, have grossly offended against the laws of this State, and have willfully,

flagrantly and grossly abused and misused their corporate authority, franchises and privileges, and have willfully and unlawfully assumed and willfully usurped franchises and privileges not granted to said defendant corporations by the laws of the State of Missouri, by then and there entering into and becoming a member of and a party to said trust, combination and confederation and pool as aforesaid, in said city of St. Joseph, Missouri, to monopolize the business of writing insurance against loss or damage by fire, lightning and storm, and to by means of said combination and confederation prevent competition in said business, and to regulate, fix and maintain the price and premiums to be paid for insuring property against loss or damage by fire, lightning and storm in St. Joseph, Missouri.

"And relator further here now charges and avers that the action of the defendant corporations as hereinbefore set out is a willful, malicious and gross perversion of the franchises granted to said defendant corporations by the State of Missouri, and an illegal, willful usurpation of privileges not granted to them, and which said gross and willful usurpation of privileges and franchises not granted them is of great and permanent injury to the public.

"Wherefore your relator herein, the Attorney-General, prosecuting in this behalf for the State of Missouri, prays that said defendant corporations, each and all of them, severally be excluded from all corporate rights, privileges and franchises under the laws of the State of Missouri, and that their rights and certificates to do business under the insurance laws of this State be declared forfeited and that proceedings at law may be issued against defendant corporations that they may each and every one of them be ousted of their said several franchises and corporate privileges."

The defendants answered jointly, as follows: "Defendants in the above entitled cause, by leave of court, file this their amended answer, and protesting that the information filed

in said cause against these defendants is not sufficient in law, for their joint and several amended answers thereto, say that they admit that they are severally and respectively corporations legally organized under the laws of their respective States and countries, for the purpose of carrying on the business respectively stated in said information; that they have respectively complied with the laws of the State of Missouri relative to foreign insurance companies desiring to write fire and other insurance in this State; that they have been respectively duly licensed by the Superintendent of Insurance of this State to write said insurance in the State of Missouri; and that they have been from the date of their respective licenses, and are now writing fire insurance and insurance against loss by lightning and storm in the State of Missouri, in so far as they are respectively, by said license, authorized to write such insurance.

"And further answering these defendants say that the said act of the General Assembly of the State of Missouri, entitled "An Act providing for the punishment of pools, trusts and conspiracies to control prices, and as to evidence and prosecution in such cases," approved April 2, 1891, and the amendments thereto, approved April 11, 1895, and March 24, 1897, is violative of the provisions of the Constitution of the State of Missouri and of the United States as follows:

"1. The title to said act infringes that part of section 28 of article IV of the Constitution of the State of Missouri, which provides that no bill shall contain more than one subject, which shall be clearly expressed in its title, in this, that the subject of insurance against loss or damage by fire, lightning or storm, is a different subject and not germane to the matters contained in the title of said act; and defendants plead that said law, in so far as it attempts to cover the subject of such insurance, is unconstitutional and void.

"2. The Constitution of the State of Missouri, section 30, article II, provides 'that no person shall be deprived of

Vol. 152 mo—2

life, liberty or property without due process of law;' and defendants say that the said act and the amendments thereto, especially as set forth in section 1 of said amended act 1897, does deprive defendants of their liberty without due process of law inasmuch as it renders it unlawful for defendants to contract or agree among themselves or with the agents of other insurance companies, or for their agents, to contract and agree among themselves, for the reasonable adjustment and maintenance of rates of premium to be charged for insurance against fire, lightning or storm in this State.

"3.   Section 1 of said amended act contravenes and infringes section 10 of article I of the Constitution of the United States, which provides that no State shall pass any law impairing the obligation of contracts, inasmuch as each of defendants, prior to the enactment of said law made the deposits and paid the fees and moneys required by the insurance laws of this State to secure  to themselves respectively the right to carry on their said business in said State, had complied with all the requirements of the insurance laws of said State, and were respectively duly authorized to conduct and carry on their said business in said State; thereby in virtue of said payments and said laws of the State of Missouri, there was vested in each of said defendants, at the time of their admission into said State, the right to contract and be contracted with, and to continue and carry on their said business in a reasonable, usual and lawful manner.   And defendants say that until the enactment of said law they and their agents had, in the safe, reasonable and usual course of their business, been making and entering into contracts or agreements with each other for the conservation of their business, and the protection of their policyholders, by adjusting, agreeing upon and maintaining reasonable rates of insurance against fire, lightning and storm, in said State; defendants say that said act does not deprive said defendants and each of them, of their said vested rights in forbidding them or their agents to make or enter into such con-

tracts or agreements and impairs the obligations of the contracts entered into by and between each of them, and said State of Missouri at the time of their respective admission into this State, that therefore said act is unconstitutional and void.

"4.   Section 1 of the amended act is in violation of section 1 of the XIVth amendment of the Constitution of the United States, which provides 'that no State shall deprive any person of life, liberty or property, without due process of law, nor deny any person within its jurisdiction the equal protection of the law,' in this, that said act and section provides for a difference and discriminates between foreign insurance companies and domestic insurance companies, and discriminates and makes a difference and distinction between foreign insurance companies insuring property in this State against loss or damage by fire, lightning or storm and all other foreign and domestic insurance companies doing other kinds of insurance business in this State, by providing by section 1 of said amended act, that it should be unlawful for any corporation organized under the laws of this or any other country, insuring property against loss or damage by fire, lightning or storm, to make any agreement and to have any understanding with any other insurance company or with the agents thereof to fix or regulate the premiums to be paid for insuring property in this State against fire, lightning or storm, or to maintain said premiums when so regulated or fixed, or to fix or limit the price or premium to be paid for insuring property against such loss, or damage in the State; and these defendants say that each and every one of them did comply with the laws of this State before being admitted to do business in this State, and that in said compliance they have paid the fees and made all necessary deposits and secured the necessary licenses required by the insurance laws of this State, and that having done and performed all that was required by law, they were each of them, duly authorized to do the business of insurance in this State, and that thereby the right to do said business was se-

cured and vested in each of them by the laws of the State of Missouri, and that they have been respectively conducting said business under the said laws of this State, and have paid and are paying sums of money for the right to conduct their said business in this State; and defendants say that said act deprives them of the right to carry on their business in a manner fair and just among themselves and not in any manner injurious to any other person in the State, and that said act deprives them of the right of making the necessary and proper contracts relating to the business of insurance, and discriminates against them and in favor of other domestic and foreign insurance companies, who are not embraced in said law, and that said act is unconstitutional and void.

"5.    That section 6 of said amended act is violative of section 1 of article XIV of the amendments of the Constitution of the United States, in that it provides 'that in all proceedings to have such forfeiture declared, proof that any such person who has been acting as the agent of any such foreign corporation in transacting its business in this State, has been, while acting as such agent, in the name, behalf or interest of such foreign corporation, violating any provision of the preceding sections of this act, shall be received as *prima facie* proof of the act of the corporation itself;' and defendants say that said act discriminates and makes a difference and distinction between foreign insurance companies doing the business of insuring against fire, lightning and storm and domestic insurance companies doing like business in like situation, by providing rules of evidence and pleading in judicial proceedings under said act against foreign insurance companies, different and more onerous than those provided for domestic insurance companies who may be engaged in the same business and do the same thing, and defendants therefore say that said act is unconstitutional and void.

"6.    And defendants plead that sections 9 and 10 of said Act, are violative of section 1 of the XIVth amendment

to the Constitution of the United States, in that it imposes upon defendants and other corporations mentioned in said act, in case judgment is rendered against defendants in proceedings under said act, attorney's fees of not less than twenty-five dollars or more than five hundred dollars, and the expenses of attorneys for the State incurred in the prosecution of such suits, when such fees are not imposed upon other corporations or judgment defendants under the laws of this State; and defendants say that said law discriminates and makes a distinction and difference between defendants as aforesaid and the State of Missouri, by imposing such fees on defendant corporations against whom judgments are rendered, when in like situation where judgments should be rendered against the State in such proceedings, no attorney's fees or expenses are imposed upon or provided to be collected from the State; and defendants say that therefore said law is violative of the Constitution of the United States and is null and void.

"7.    And further answering these defendants deny each and every allegation in said information contained, not hereinbefore admitted to be true.

"And defendants having fully answered pray to go hence respectively dismissed with their costs in this behalf expended."

The reply is a general denial of the new matter set up in the answer.

Upon these issues a vast volume of oral testimony has been taken.    Briefly stated the ultimate facts established by the evidence are these:    All of the defendants are corporations organized under the laws of sister States or of foreign countries, and are doing a fire insurance business in Missouri under licenses issued to them by the Superintendent of Insurance of this State.    With the exception of The Newark Fire Insurance Company, Norwalk Fire Insurance Company, London Assurance Corporation, Citizens Insurance Company of New York, Union Insurance Company of Philadelphia, and

Equitable Fire & Marine Insurance Company of Providence, R. I., all of the defendant companies are represented by agents at St. Joseph, Missouri, and all those agents had been prior to and were at the date of the institution of this proceeding, members of the Underwriters' Social Club of St. Joseph, Missouri.

Prior to the taking effect of the amendment of 1895 (Laws 1895, p. 237) to the laws relating to "Pools and Trusts," which for the first time brought fire insurance companies explicitly and specifically within the ban of the law prohibiting trusts, there existed in Missouri an association called the "Association of Fire Underwriters of Missouri," which was organized for the purpose of controlling rates of insurance in this State. W. J. Fetter was employed to fix such rates, and all insurance was required to be controlled by the rates fixed by him. When the act of 1895 went into effect, Fetter addressed the following letter to all the companies doing a fire insurance business in Missouri:

"MISSOURI FIRE INSPECTION AND ADVISORY BUREAU.

"*Inspection of fire risks and estimates of rates furnished to order.*
"*Also maps of rated towns not mapped by Sanborn-Perris Map Co. Offices: American Bank Building.*

"Kansas City, Mo., June 11, 1895.

"Dear Sir:—You are probably aware that an amendment has been made to the anti-trust law of Missouri to include fire insurance companies, thus prohibiting all combinations of persons or corporations from making or maintaining fire insurance rates. My arrangement with the Association of Fire Underwriters of Missouri for state rating will therefore cease on 20th inst., and the State Board will then no longer exercise jurisdiction over rates.

"In view of these facts I have concluded to make estimates of fire insurance rates and publish maps, on my own voli-

tion, without any connection with any board whatever, and without combination with any companies or individuals. These rates so made will be published and sold to any person or company desiring to buy them. The price of the rate books, and corrections from time to time, will depend in some measure on the amount of work made necessary by the greater or less volume of business transacted in the State by the company. It is estimated, however, at about 8-10ths to 9-10ths of one per cent of the premiums. For his work bills will be sent quarterly.

"The local board of St. Louis and Kansas City being exempted from the operation of the law, have separate arrangements for rating, and will have no control of nor responsibility for the above proposed system of rating.

"Soliciting your subscription to my rate-books and supplements in cities or towns where you are represented, I remain," etc.

The prior and subesquent proceedings are best told by the testimony of Fetter himself.

"*W. J. Fetter testified on behalf of informant, as follows*:

"I have been in the insurance business in Missouri forty nine years, excepting two years that I was in Saline county, and have been in Kansas City sixteen years.

"Witness was here handed a list of the companies that were defendants in the suit, and he said that he had heard that they were all doing business at St. Joseph. I furnish estimates for Kansas City, Missouri; have been doing so since '91. I furnish them anywhere in the State they are asked for if I can. I furnish them in towns where they are asked for except St. Louis. Am satisfied that the rates furnished by me in the book known as the "Fetter Rate Book" for different towns of the State, are the basis of rates upon which a considerable amount of the business of the State is written. I do not know whether there is an agreement among the agents at St.

Joseph or not. Have no real knowledge about the situation at St. Joseph. I have heard loose talk, and have heard it as a fact, that my rates are used. I do not furnish the rates to the agents at St. Joseph, but furnish the rates direct to the companies. I sell the book directly to the insurance companies. That is, I furnish the book either to the companies or the general agents of the companies, not to the local agents. I furnish my rate book to the general agents of all the companies that do business in St. Joseph. There are corrections that go with the book from time to time, and I supply those and they are sent direct to the companies. I had a young man named E. F. Scott in my office at Kansas City. He was a dry goods clerk when he came to my office and got acquainted with some of my boys and they asked me if I could not get him a job. He kept on coming there, and I gave him work at $10 a week, and he did good service and I increased his salary, and after a while somebody asked me if I knew a good clerk, some man that was good in figures, and I said yes I know a man, and they said they would like to see him. Well, I did not say anything to him; I thought maybe they would not employ him; I telephoned to him to come to the depot; that I had something I wanted to know about; and he came down and I introduced him to two insurance agents from St. Joseph, one of them was Mr. Buckingham, and I do not remember the other gentleman's name. I introduced Mr. Scott to them and he was employed, and I supposed that he was hired to work in the insurance business, but I never asked what his duties were. The general agent for Missouri of the Fireman's Fund Insurance Company is Mr. Chard of Chicago, and in the period from November, '96 to July, '97, I think I furnished the special agent of the Fireman's Fund a rate book for Missouri. The record in my office would simply show that I furnished it to the company. I did at one time send my rate books direct to the company, but I concluded that was wrong, or, rather, inexpedient. My rate books cover all of Missouri

except Kansas City and St. Louis, except some few towns not surveyed and examined. I mean by this, small towns. If the companies want towns rated we go and make an estimate. These rate books are not furnished annually, but just as they are made. The last book I made for St. Joseph, Missouri, was in 1897. I can not say what the companies do with the rate book. I furnish them for St. Joseph. I sell the rate books to any company that wants to buy them. I do not know of anyone else in Missouri, outside of St. Louis and Kansas City, from whom the old line fire insurance companies buy rate books and rate sheets. Before the anti-trust law was passed, I was employed by the State Board for Missouri, on a salary, and I covered the same territory that I do now. The State Board was composed of seventy or eighty persons. Now I am not so tied down by rules and regulations, and I feel at liberty to increase or decrease the rates as I think feasible. For instance, at Jefferson City, Mr. Orear thought my rates were a little too high, and he wanted me to look into it. I found that the buildings had improved; that they had put in more fire proof buildings, and I made a reduction in the rates. I do not account to anybody for that: I just make it of my own volition, and two or three other places the same way. I have more discretion now than I had before, or, rather I exercise more. It is the tariff the companies accept at Jefferson City as fixed by myself. I get my rates in the following way: Take for instance St. Joseph. I take a brick building. An ordinary brick building at St. Joe, with gravel roof, makes the basis rate sixty cents, and then if the side walls do not extend two feet higher than the roof, that is where they are exposed, we add five cents. If there is a sky light that goes on to the building we add for that. If wooden cornice, not iron, add to the rates; if elevator in three or four story building, we add for that, and all similar charges add something for each. Then if an exposure—other buildings might burn it—we add to it in proportion to the hazard for exposure; and then the

question of the area comes in, the size of the building. If a very large building we have a very small charge to it, and when the rate of the building is made up then we add for the stock being more perishable; or when a building is easier damaged by smoke, water, etc., from ten to twenty-five cents, more or less. There are two classes of stock, the preferred and the non-preferred. This is the method by which I get at the rate, and I get the personal knowledge of the buildings by going to St. Joseph and examining them. I had the rate book for St. Joseph printed in St. Joe, and it took me nine months to get it printed. I paid for having the book made. *When the anti-trust law of '91 went into effect, we paid no attention to it, as we thought it did not include us, and I furnished rates for St. Joseph then just the same as I had been doing before...I furnished the rates for St. Joseph before 1895, I made a book for St. Joseph before that time. Before the anti-trust law, I was employed on a salary to make the rates and furnish them for the different towns, St. Joseph as well as the others...After the anti-trust law of 1895 became operative, I read the law. It seemed to me that the law provided against combinations to make rates.* The State Board was then abolished. I sent out a circular to the companies and stated in substance that the State Board was out of existence, and that I proposed to make estimates of rates and sell them to the companies, without any connection or association with anything at all and sell these rates at a given price—this book at a given price, and that included the keeping up of the books, too. *These books I offered to make were of the same kind and character I had been making.* I asked the companies to purchase my books and some purchased them and some did not. *The agents that got my rate books at St. Joseph and the correction slips I furnish, got them from the companies."*

Witness was here handed a copy of the petition containing a list of the companies against which suit is brought, and

was asked if he had examined this list of companies, and he said he had, and that he furnished a portion of these companies with his rate book between November, 1896, and July, 1897, and he designated as those that he had furnished the rate book to as follows:    Aetna of Hartford, Orient of Hartford, Phoenix of London, British America, Westchester Insurance Company, Atlas, Commercial Union, London & Lancashire, Lion's, Lancashire, London Assurance, Union & Crown, London & Globe, Imperial, Manchester, Northern, North British, Palatine, Royal Insurance Company, Sun Insurance Office, Aachen & Munich, Hamburg-Bremen, Prussian National, German of Freeport, Traders' Insurance Company, Springfield Fire & Marine, Michigan, Detroit, St. Paul, Merchants' of Newark, The Agricultural, Caledonian, American Fire Insurance Company of New York, Citizens' of Missouri, Commercial Union, German American, Hanover, Home, Niagara, Queen, Westchester, Glens Falls Insurance Company of North America, Union Insurance Company of Philadelphia, Pennsylvania Fire, Merchants' Insurance Company of New Jersey, Providence-Washington, Scottish Union & National, Concordia, Milwaukee Mechanics,' Brooklyn.

"I know Mr. Buckingham at St. Joseph, and from November, '96 to July, '97, he was in the insurance business, and a local resident agent of various companies at St. Joseph; and he came to inquire about some one to do a certain class of work.    I recommended Mr. Scott.    The companies responded to my circular that they would buy the rates.    I suppose the agents at St. Joseph got the rates from the companies, as I mail no rates from my office in Kansas City to the agents at St. Joseph, Missouri.    I did at one time send the slips direct to St. Joseph.    I do send the slips direct to the agents sometimes in this way:    The companies buy my rates and they will say to me, 'I want you to send a copy to Mr. John Smith at Sedalia; he has not a copy'; and they want me to send to this one and to that one; and the agent at St. Joe wants me to send slips,

and if the companies order me to I send the slips, but not otherwise. I did that a short time and I concluded I would not do it any more, but if the companies order me to send the slips or books to any town in Missouri, except Kansas City, I will do so.

"Q. Can you name any of these companies that were doing business as is charged in this petition in the city of St. Joseph, between November, 1896, and July, 1897, at whose instance you sent any of those slips? A. As I understand the fact, several, I think, have them, but to say that they do I could not. I was told recently that an agent there at St. Joseph who has the agency of the Northern and of the Home, and two or three companies that way, did, but I do not know, and there are no records in my office that would indicate whether or not I sent the slips or rates direct to the agents at St. Joseph, Missouri; but I probably did, occasionally, between November, 1896, and July, 1897. I think probably in the interim of time from November, 1896, to July, 1897, I did forward the slips, as well as the books, to some resident agent at St. Joseph, Missouri, I might have a record in my office, my books might show, probably I have. We have a list of the companies who take the slips and the rate books. Some of them do not want anything but this town and that town, but otherwise they get everything. We just send them to the company indiscriminately, and only send direct to the resident agents, either the slips or books, by direction of the company. *I would send the slips regularly to resident agents at St. Joseph on condition that every agent have an order from some company of his, so that all the agents get the books; but in the absence of directions I send the slips to the companies. To the best of my knowledge, the insurance business at St. Joseph is generally done at the rate fixed in my rate book and my slips...The rate I fixed is based on the proposition that the companies will, by securing the rate I name, be enabled, according to insurance statistics, to meet losses, pay expenses and*

*a fair dividend on the capital, and that is what we term an adequate rate.* I aim to make an adequate rate. I suppose that is the reason the companies want my rates. *I charge the companies about eight or nine-tenths of one per cent of the volume of business.* That is the only way I can fix it. I can only do this work for the companies on a per cent of the business, and I get the volume of business of the companies from Mr. Orear, Superintendent of Insurance. This nine-tenths of one per cent is nine-tenths of one per cent of all the premiums, and for that I furnish the companies with my rate book and corrections, and such mass of information as they may desire and that I may have in my possession; and that is my compensation complete from the companies. I pay my own clerical force in my office. This book is a St. Joseph book." [Here book was shown witness]. "This is the only rate book published by myself for the city of St. Joseph. The policy that is written and the reports that are made of the daily business in St. Joseph does not come to my office."

CROSS-EXAMINATION: "I make the Fetter rate book. I sell it to any insurance company that desires it. I make it as an insurance expert. The use of a rate book of this kind is to give the agents an idea of the risks and the adequacy of the rate."

RE-DIRECT EXAMINATION: "My compensation is governed by the volume of business done by an insurance company. I sell this book to any company that wants to buy. I have been doing that since the anti-trust law went into effect. *The rates were made about on the same basis by myself after the anti-trust law became operative as before.*"

After the act of 1895 became operative, the agents of the defendant companies (except those above pointed out) got together and formed the Underwriters' Social Club of St. Joseph. The president of the club, Mr. Wise, said: "We can not in this club recognize anything in writing that would lay ourselves liable to a prosecution under the late law passed regarding trusts in Missouri. Consequently, anything that is

*done regarding the maintenance of rates shall be understood among the members of the club.*"

Accordingly no constitution or by-laws were ever adopted or put into writing. The secretary of the club was E. F. Scott, who had formerly been a dry goods clerk, and for a short time before he went to St. Joseph was a clerk in Fetter's office in Kansas City. He had no other experience in the insurance business. The club had two rooms. In one the secretary had a copy of Fetter's rate book, a map, a desk and a few chairs. In the other there were some chairs. It had no regular time for holding meetings. Sometimes it met once a week and sometimes not once in three or four weeks. One of the members defined its purpose to be, "that one of the objects of the club was social and advisory to our business. The social nature of the club was talking to each other about Lloyds insurance companies and the mutuals and inquiring about how business was and generally anything appertaining to our business . . . There were no billiard nor card tables in the room. No periodicals kept there. I guess there was a desk. I never took an inventory of it. I couldn't tell whether there was a carpet on the floor."

Another described the purposes of the club as follows: "To the extent of smoking cigars one of the objects was to cultivate good-fellowship, another object was to become better acquainted with each other and with the methods of doing business; also to become better acquainted with all risks in St. Joseph, and get wider and more general information about insurance business and about conducting insurance business; another object was to secure a uniformity of policies, as in adjustment of partial losses the losses become extremely complicated, and it requires the highest order of ability to adjust such a loss. Concurrency is therefore insisted upon by the manager, Mr. Scott; that is one of the things accomplished by the club. That is, it is deemed beneficial to the insurer and makes it easier to adjust any losses. In speaking of the objects

of the club, I use the words 'correct practices,' which covers all this, and means the application of concurrency and the application of a general form to a big scattered risk. *I also stated that the object was to maintain rates."*

The salary of the secretary was made up by the members contributing one dollar a month for each company represented by the members. Some of the members charged this to their companies direct and it was allowed. Others put it in as "postage" or other expenses and their companies allowed it in that form.

After the formation of this club, the fire insurance done by the agents of the defendant companies was carried on in this way: the secretary had a list of the numbers of all policies in the agent's office, so as to enable him to keep check on every daily report that went to the company; the daily report contained the name of the company by which the policies were written, the name of the assured, the date of issuance and of expiration, the amount of insurance, premium, rate, general form of policy, the property insured with its location. These daily reports were made out by the agents, placed in stamped but unsealed envelopes addressed to the company issuing the policy, and the envelopes were turned over to the secretary of the club for inspection and to be sealed and mailed by him. He kept no record of anything that was done in his office, but at first, if there was a variance between the rate specified in the policy and that fixed by the Fetter rate, the secretary would put a small slip on the report to notify the general agent of the company of the variance; afterwards it was thought "inexpedient" to have any such matters in writing, so the secretary simply notified the agents verbally of any variance and demanded to know the reason therefor. In this way every daily report from an agent to his company passed under the inspection of the secretary, and he alone mailed all reports to the companies. To prevent an agent from writing a rate in the policy in conformity to the Fetter rate and afterwards

giving the insured a rebate, all the agents also submitted all their monthly statements to the secretary and he inspected them and likewise mailed them.    Several times an agent was detected not living up to the Fetter rate, and then the club met and the offending agent was called on for an explanation, which was accepted as satisfactory and "everybody arose to their feet and expressed a determination to live up to the rates" (Fetter's rates).    There was an unwritten by-law of the club prescribing that "where a member was caught cutting a rate there was to be a penalty of not to exceed $50, for the first two offenses, and after that loss of his agency."    Some of the general managers of the defendant companies testified that they had never heard of the club or its practices until this proceeding was begun; others testified that they had expressly refused to allow their agents these club expenses and had charged them back to the agent; while the manager of the Queen Insurance Company wrote the local agent as follows: "While we are not fully advised as to the situation in St. Joseph, yet, at the same time we understand that all agents, with the exception of your good self, are now members of the Social Club.    In the interest of harmony and correct practice we trust you will find it convenient to associate with the organization referred to, as it will undoubtedly redound to our mutual welfare."

I.

The special provision of the Statutes of Missouri under which this proceeding is prosecuted and which it is claimed the defendants have violated is section 1 of the Act of 1897 (Laws 1897, p. 208) and is as follows:

"Section 1.   Any corporation organized under the laws of *this* or *any other state* or *country* for transacting or conducting any kind of business in this State, or which does transact or conduct any kind of business in this State, or any partnership or individual, or other association of persons whatso-

ever, who shall create, enter into, become a member of or a party to any pool, trust, agreement, combination, confederation or understanding with any other corporation, partnership, individual, or any other person or association of persons, to regulate or fix the price of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever, *or the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, or to maintain said price when so regulated or fixed, or shall enter into become a member of or a party to any pool, agreement, contract or combination or confederation to fix or limit* the amount or quantity of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, any product of mining, or any article or thing whatsoever, or *the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm,* shall be deemed and adjudged guilty of a conspiracy to defraud, and be subject to penalties as provided in this act: Provided, however, that the provisions of this section shall not apply to agreements of fire insurance companies, or their agents, or boards of fire underwriters, to regulate the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm in cities in this State which now have or which may hereafter acquire a population of one hundred thousand inhabitants or more; and provided, further, that if such insurance companies or their agents, or the board of fire underwriters doing business in any such city, shall combine in such city, either directly or indirectly, or agree or attempt to agree, directly or indirectly, to fix or regulate the price or premium to be paid for insuring property located wholly outside of such city against loss or damage by fire, lightning or storm, such company so violating the provisions of this act, either by itself, its agents, or by any such board of underwriters, shall be taken and deemed to have forfeited its right to do business in this State, and shall become liable to all the

penalties and forfeitures provided for by the provisions of this act."

The first question, therefore, is whether the defendant companies have entered into or become members of or parties to a pool, trust, agreement, combination, confederation or understanding to fix the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm or to maintain said price when so regulated or fixed.

There is no room for doubt that prior to the amendment of 1895, which specifically brought insurance companies within the purview of the anti-trust laws, the Association of Fire Underwriters of Missouri, was organized and maintained for the purpose of establishing and maintaining the rates at which property in Missouri would be insured against loss or damage by fire, and that Fetter was employed by the association to fix such rates and see that they were maintained. Neither can it be doubted that when the Act of 1895 became effective that association realized that its practices were violative of that act and hence the association ceased to exist. This is clearly shown by the testimony of Fetter and by his letter of June 11th, 1895, above referred to. After the passage of that act Fetter, on his own account, published a book of rates which were the same as the rates that had been fixed and maintained by the Association before the law went into effect. This book, with correction-slips keeping it up to date, he sold and delivered to the defendant insurance companies direct, except that when specially instructed by a company he sent them to the local agent instead of to the company and having it (and the correction-slips) reach the agent through the company. All of the local agents of the defendant companies at St. Joseph, had the books and the slips. Except in very extraordinary cases, all policies were written according to the Fetter rates, and when there was a variance the general agent was, at first, notified by a slip attached to the daily report, and later when it was considered "inexpedient" to commit such matters to writ-

ing, the local agent was notified, and if it was not corrected the local agent was called to account therefor.   Fetter had no fixed price for his book and slips but charged each company eight or nine-tenths of one per cent of the volume of business done by each.

After the Act of 1895 became a law, the local agents of all the defendant companies, except those above noted, formed the Underwriters' Social Club of St. Joseph.   The president distinctly stated that it would not put anything in writing that would lay the members liable to prosecution under the Act of 1895 relating to trusts, and that everything that was done regarding the maintenance of rates would have to be understood by the members.   No written constitution or by-laws were ever adopted.   The club had no regular meetings, no club furnishings, paraphernalia or usual accompaniments.   When it met each man smoked his own cigars, and talked about Lloyds insurance companies and the mutuals, about "concurrency" and "correct practices," which was but another name for maintaining the Fetter rates, or else called a member to account for a variance from the Fetter rates, and although "whitewashing" him, "everybody arose to their feet and expressed a determination to live up to the rates."   When the club was formed a committee was appointed to select a secretary (doubtlessly one who was peculiarly social), and the committee went to Kansas City and consulted Fetter, who kindly let them have one of his clerks, whom he had taken out of a dry goods store a short time before and who was therefore presumably "social," even if he was not an insurance expert, and knew nothing about St. Joseph or its insurable risks.   This young man was taken to St. Joseph and made secretary of this Social Club.   He was installed in a room, with a copy of Fetter's book, a map of St. Joseph, a desk and a few chairs.   In order that he might not become lonesome in the club rooms (where the members assembled only on rare occasions to smoke their respective cigars, talk about Lloyds, the mutuals, concur-

rency, correct practices, call an offending member to account for writing a policy at a rate that varied from Fetter's, and stand up and promise to live up to the rates), and just to be social, each of the local agents of the defendant companies sent him their daily reports, already inclosed in unsealed envelopes, addressed to their respective companies, and just to be social he examined each report and so as not to forget his former benefactor, he compared the rates specified in each policy with the Fetter rates, and if there was a variance put a slip on the report calling the attention of the general agent of the company to the variance, until it was discovered that this practice was "inexpedient" and in conflict with the expressed policy of this social club not to put anything in writing that would lay the members liable to a prosecution under the anti-trust laws, and then he adopted the more social process of notifying the local agents personally of the variance. Of course each agent only wanted to keep up this daily social communication with the secretary of the club; and of course, the secretary only wanted to be social when he insisted upon concurrency, correct practices and the exclusive right to seal and mail all the reports from the local agents to the companies; and of course, the monthly reports were likewise submitted to the secretary for social reasons and not for the purpose of advising him that the agent had not circumvented Fetter's rates by giving the insured a rebate from the rate written on the face of the policy; and of course the higher officers of the defendant companies did not know (after it was deemed inexpedient for the secretary to put slips on the daily reports showing variances from the Fetter rates) that their naughty local agents belonged to the social club, whose practices might, if put in writing, make them liable to prosecution under the anti-trust laws, and hence had forbidden them to be social, notwithstanding they did know that the policies were all written according to the Fetter rates and were the same as they were before the anti-trust laws were enacted; and of course the general managers wondered

why they had taken the trouble and gone to the expense of maintaining the Association of Fire Underwriters of Missouri and had paid Fetter a salary to fix and maintain a rate in Missouri before the passage of the anti-trust law in 1895, when after that law went into effect their local agents could maintain the same old rates, either unassisted and at no expense to their companies or else by means of a social club, which cost the companies nothing!

But we decline to believe anything of the kind. The formation of the club immediately after the passage of the Act of 1895, is admitted. The maintenance of the old Fetter rates as established and practiced by the Association of Fire Underwriters of Missouri, which was abolished immediately after the passage of the Act of 1895 because it would violate that law, is not denied. The character of the club arrangements and that it had no constitution or by-laws and only occasional meetings is conceded. The fact that all daily and monthly reports were submitted to this inexperienced young man, who was not an insurance expert, by all the local agents of the defendant companies, and that he alone had a right to seal and mail the reports to the companies is confessed. The fact that each company paid Fetter for his book and correction slips a percentage on the volume of its business, and that the book and slips were sent by Fetter to the company and by the company to the local agent or else by Fetter to the local agent direct when ordered so to do by his company, is proved and not controverted. And the conclusion is inevitable and irresistible that the Underwriters' Social Club of St. Joseph is a plain, palpable, but bungling, pool, trust, agreement, combination, confederation and understanding organized to evade the anti-trust laws of Missouri but wholly inefficient for such a purpose. The local agents did it and all knew it, and their knowledge is the knowledge of their companies, and their acts are the acts of their companies. (Nickell v. Phoenix Insurance Co. of Brooklyn, 144 Mo. 420.) For it could not be tol-

erated for a moment that an insurance company could hide under the skirts of its agents and violate the anti-trust laws of our State with impunity. These corporations can only act through agents and if their agents' acts or practices are in violation of their orders, they must suffer the consequences, for the law must be enforced whether the act violating it is done by one or another of the agents of the corporation. The company can and must control its agents, and must see, at its peril, that its agents do not violate the law while attending to the business of the company. This is the rule as to libels, assaults, malicious torts by agents of incorporated companies and there is greater reason for it being the true rule in cases involving the anti-trust laws. In fact, unless it was so, no company could ever be convicted of a violation of those laws, for they would do as the president of the Social Club said the club must do, put nothing in writing that would make them liable to prosecution; keep no records; leave no tangible evidences or tracts of their doings.

A few illustrations of the liability of a corporation for the willful or malicious torts of its agents, committed while in the prosecution of the company's business committed to their care although the act is unknown to the president, board of directors or manager of the corporation, will be sufficient to point the rule:    For libel, Buckley v. Knapp, 48 Mo. 152; Johnson v. St. Louis Dispatch Co., 65 Mo. 539, and this extends to liability for criminal libel.    State v. Boogher, 3 Mo. App. 442; Brennan v. Tracy, 2 Mo. App. 540.    For malicious prosecution, Boogher v. Life Association, 75 Mo. 319.    For assault and battery, Perkins v. Railroad, 55 Mo. l. c. 214.    For conversion, Sherman v. Commercial Printing Co., 29 Mo. App. l. c. 38.    For trespass, Favorite v. Cottrill, 62 Mo. App. 119.

In this case, however, the companies can not be heard to say that they did not know of or sanction the acts of their agents for they have answered jointly, and boldly confess that they are writing insurance in this State because they have been

licensed to do so; and then they challenge the constitutionality of the Act and assert that it violates five different provisions of the Constitution of Missouri or of the United States, and contend that having been admitted to do business in this State before the passage of the Act of 1895, they acquired a vested right to do so in a manner fair and just among themselves, which vested right can not be taken away from them by the Act of 1895, without violating the XIV amendment to the Constitution of the United States.   In short their answer is a clear admission that they have violated and do violate the Act of 1895, but they declare that they have committed no offense in so doing because they say that act is unconstitutional.   It is true that the answer closes with a general denial of all the allegations of the petition not admitted by the answer to be true, but this avails nothing in view of the character of specific defenses pleaded which are all predicated upon the facts charged being true.   If this be not the meaning of the answer then so much of it as raises so many constitutional questions amounts only to a moot court proceeding, for if it be true that the defendants have never done the acts charged but have observed the requirements of the Act of 1895 and avoided its inhibitions, then it is wholly immaterial in this case whether the Act is constitutional or not.   It is only upon the theory that they have violated it, that they can be heard to question its constitutionality. And this is clearly the idea of the pleader in this case, and is the only way in which the general denial can be made to consist with the specific defenses.   [Mississippi Valley Trust Co. v. McDonald, 146 Mo. l. c. 480.]

This brings us to the question whether the acts done constitute a pool, trust, conspiracy or unlawful combination. The evident purpose of the Social Club was to maintain the Fetter rates.   To accomplish this, their practice was for each agent to submit to their common agent----the secretary of the club----a daily report of all the policies written by each.   This was done to enable him to see that they were not writing policies at a

less rate than the Fetter rates. It could have been for no other purpose, for he was not an insurance expert and they were experts, so they did not need his judgment or advice as to whether the risk was a proper or safe one. He could only watch them and see that they followed "correct practices," that is, charged the Fetter rates. They could each have done this without him, but he was employed to watch them all for the benefit of each; to catch anyone who attempted to cheat his confederates in the trust. This could have been the only purpose of submitting all the daily and monthly reports to him and having him mail them to the companies. The companies all knew what rates their agents were to charge, for the Fetter books and slips were bought by the companies and furnished to their agents as a part of their supplies. They knew that the Fetter rates were charged and lived up to, because they could see that fact from every policy they issued. So that the purpose, plan, pool and trust is plain. The practice under the trust is also plain. The fact that the parties to the trust were treacherous to each other, and in the desire for business, violated the trust agreement and occasionally wrote policies for less than the Fetter rate, does not even tend to disprove the existence of the trust, for it is the experience of all lawful as well as unlawful associations that some of the members will violate the common agreement for a selfish purpose, and hence penalties are usually provided (as they were in this case) for such violations. Of course there was no written agreement forming the trust, for that was "inexpedient" and might make the members liable to prosecution under the trust laws, as the president of the club well and wisely remarked when the club was formed. When people set out to do acts that are either *mala in se* or *mala prohibita* they do not put up a sign over the door or a stamp on the act declaring their purposes and intent. Concealment is generally their prime object. But as such matters exist without agreements and rest upon common understanding and practice, so the proof of their existence may

be of the same character, and while such laws are penal in their nature and should be strictly construed [State ex rel. v. Talbot, 123 Mo. 69; State ex inf. v. Bland, 144 Mo. 534], nevertheless a pool or trust may be as conclusively proved by facts and circumstances as by direct, written evidence, for in this regard they are like all other frauds, and as was well said by CAMPBELL, J., in Webber v. Jackson, 79 Mich. 1. c. 180, "While fraud is not to be assumed without proof, it is nevertheless oftener shown by circumstances than any other way. When things appear that are contrary to the ordinary ways of honest business men, and call for explanations which might be, but are not, given, it is no violent inference to conclude that there is something wrong. And where this occurs repeatedly, and is the general characteristic of the conduct and statements of the parties, it is their own fault if they are held to the consequences;" and as was equally as well said by SHERWOOD, C. J,. in Baldwin v. Whitcomb, 71 Mo. 1. c. 659, "Whenever fraud is the matter in issue, any unusual clause in an instrument, *any unusual methods of transacting the business,* apparently done with the view for effect and to give to the transaction of the business an air of honesty, is of itself a badge of fraud."

Pools and trusts are not of modern origin. The courts, at common law, ferreted them out and placed the stamp of disapproval on them. Then they usually took the form of contracts in restraint of trade or creating monopolies. As early as the case of Mitchell v. Reynolds, 1 P. Wms. 181, Chief Justice PARKER laid down the rule that such contracts were void if they were general, and BEST, C. J., in Homer v. Ashford, 3 Bingham 328, said: "The law will not permit anyone to restrain a person from doing what the public welfare and his own interests require that he should do." The same rule was laid down by PARKE, B., in Mallan v. May; 11 M. & W. 653. In those early days there was no legislation against such practices, but from the beginning the courts have recognized the dangers attending such combinations and in the ab-

sence of criminal, penal or prohibitive statutes have refused to enforce such contracts.    It is not necessary here to review the cases where courts have held contracts valid which only partially restrained trade.    It is only necessary to call attention to the fact that in exceptional cases the main purpose of the contract was lawful and the restraint was only a necessary incident or ancillary to the contracts, "to protect the covenantee in the enjoyment of the legitimate fruits of the contract or to protect him from the dangers of an unjust use of those fruits by the other party."    [United States v. Addyston Pipe & Steel Co., 54 U. S. App. 1. c. 747.]

In the case just quoted TAFT, circuit judge, delivered the opinion of the court, which was concurred in by Mr. Justice HARLAN and LURTON, circuit judge, and we might well leave the law of the case at bar to depend upon that decision, for it is a most lucid, learned and luminous exposition of all the law, ancient and modern, upon the questions here under consideration, so much so in fact, that any attempt to enlarge upon the authorities cited and reviewed and the reasoning employed by the learned judge, would prove futile, feeble and foolish. After reviewing the instances where pools and trusts have undergone judicial scrutiny and condemnation, Judge TAFT says: "Upon this review of the law and the authorities we can have no doubt that the association of the defendants, however reasonable the prices they fixed, however great the competition they had to encounter, and however great the necessity for curbing themselves by joint agreement from committing financial suicide by ill-advised competition, was void at common law because in restraint of trade and tending to a monopoly." And so it is here.    But the common law remedy of refusing to enforce such contracts proved insufficient to prevent the blighting injuries to the public interests which modern trusts produced, and hence is has been found necessary by the National and State legislatures to enact drastic laws against trusts, pools, unlawful combinations and conspiracies, which will pre-

vent and punish them and not leave them to exist and enforce their contracts among themselves, denying them only the aid of the courts, as at common law. The General Assembly of Missouri has done its duty in this respect. Our statutory law has been progressive. The Act of May 18th, 1889 (Laws 1889, p. 96), entitled "An Act entitled an act for the punishment of pools, trusts and conspiracies, and as to evidence in such cases," as was to be expected, was not efficient to meet all cases, and it was therefore found necessary to amend it in 1891 (Laws 1891, p. 186). Even this proved insufficient, and it was amended again in 1895 (Laws 1895, p. 237). Again the law was found not comprehensive enough to meet all cases (like this case, for instance) and the General Assembly proved itself equal to the exigencies of the occasion and passed the Act of 1897, under which this proceeding was instituted (Laws 1897, p. 208). This Act in express terms covers the case at bar, and the courts would be recreant to their duty, their past meritorious rulings, and to the principles they profess to practice and to teach, if they let the game out of the legislative trap in which it has been caught, by any forced construction of law or any distortion of the facts or any maudlin sentimentality superinduced by the magnitude of the interests involved.

The Underwriters' Social Club of St. Joseph is a pool, trust and conspiracy organized and maintained by the defendant companies, and is therefore an unlawful combination, and subject to the penalties prescribed by the Act of 1897. "A conspiracy is a combination of two or more persons to accomplish an unlawful end by lawful means or a lawful end by unlawful means." [United States v. Addyston Pipe & Steel Co., 54 U. S. App. l. c. 764.]

A trust is a contract, combination, confederation or understanding, express or implied, between two or more persons to control the price of a commodity or service, for the benefit of the parties thereto, and to the injury of the public, and

which tends to create a monopoly. As was said by Chief Justice FULLER in United States v. Knight Co., 156 U. S. 1. c. 16, "Again, all the authorities agree that in order to vitiate a contract or combination it is not essential that its result should be a complete monopoly; it is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition." In the United States v. Trans-Missouri Freight Association, 166 U. S. 1. c. 342, it was said: "For these reasons the suit of the government can be maintained without proof of the allegation that the agreement was entered into for the purpose of restraining trade or commerce or for maintaining rates above what was reasonable. The necessary effect of the agreement is to restrain trade or commerce, no matter what the intent was on the part of those who signed it." Just so here, the practice of the members of the Social Club had the effect of maintaining the Fetter rates and hence constituted it a trust, no matter whether the members intended it to have that effect or not (and we have no doubt they did so intend it), and no matter whether they also intended it to be "social" in the manner hereinbefore indicated or not.

In the olden times such practices were called contracts in restraint of trade. Now-a-days they are called trusts. There is no difference in the principle. There is a difference in the extent and methods. Those the courts condemned long ago were as mere saplings compared to the mammoth oaks, when considered alongside of those of to-day. When the evils to the public interests that flow from these trust combinations are attempted to be described, words become mere weaklings in their power of expression, and one stands appalled at the helplessness of the people outside of judicial aid. This case strikingly illustrates the condition and calls aloud for the enforcement of the statute.

The facts establish the case laid against the defendants, and the statutory results must follow, if the statute is valid.

## II.

The defendants challenge the constitutionality of the anti-trust law of Missouri, and cite two specific provisions of the Constitution of Missouri, and the XIV amendment of the Constitution of the United States which the Act, or some part of it, violates, and we will consider the points in the order they are pleaded.

1st. The title of the Act of 1891 and the amendment thereof in 1895 and 1897 is said to infringe "that part of section 28 of article IV of the Constitution of Missouri, which provides that no bill shall contain more than one subject which shall be clearly expressed in its title, in this; that the subject of insurance against loss or damage by fire, lightning or storm, is a different subject and not germane to the matters contained in the title of said Act."

The title of the Act of 1891 is, "an Act providing for the punishment of pools, trusts and conspiracies to control prices, and as to evidence and prosecution in such cases."

In Ewing v. Hoblitzelle, 85 Mo. 64, it was held that: "When all the provisions of a statute fairly relate to the same subject, have a natural connection with it, are the incidents or means of accomplishing it, then the subject is single, and if it is sufficiently expressed in the title the statute is valid." In State ex rel. v. Miller, 100 Mo. l. c. 445, BLACK, J., said: "In adopting a title the legislature may select its own language, and may use few or many words. It is sufficient that the title fairly embraces the subject-matter covered by the act; mere matters of detail need not be stated in the title." These cases have been many times cited approvingly and have never been overruled and state the law to-day. If a combination, arrangement or understood course of dealing to fix and maintain prices or premiums to be charged for insuring property against loss by fire constitutes a pool or trust or conspiracy then the title of the Act of 1891 and its amendatory Acts covers and em-

braces it. That it is a pool or trust or conspiracy is fully shown by what is hereinbefore said. It follows that this contention is untenable. The Supreme Court of Kansas reached the same conclusion in the case of In re Petition of Pinkney, 47 Kan. 89.

2d. It is claimed that section 30 of article II of the Constitution of Missouri provides that "no person shall be deprived of life liberty or property without due process of law," and that this Act violates that provision because, "it renders it unlawful for defendants to contract or agree among themselves or with the agents of other insurance companies or for their agents to contract and agree among themselves for the reasonable adjustment and maintenance of rates of premium to be charged for insurance against fire, lightning or storm in this State."

This is a total misapprehension of the Act. It does not prohibit any company or the agent of any company from contracting with any person who desires to insure his property upon any terms they two may agree upon. This is the extent and true meaning of the right to contract.

It does prohibit any company by itself or through its agents contracting with any other company or its agent *not to contract* with the insured except upon terms which such insurance companies or their agents have previously established. In other words, it protects the company against the temptations of a trust or monopoly by refusing to permit it to strip itself of the power to freely contract, for under the arrangement shown in this case the applicant for insurance is free to contract but the company and its agent has already limited and qualified its power by its previous contract with another company or its agent. The law has made this provision more out of regard for the otherwise helpless insurer than from tender consideration for the insurance company, but it incidentally preserves what it is here claimed it denies, the free, unrestrained power to contract by both parties to it. Such laws

have not only been adjudged constitutional by the Supreme Court of the United States (United States v. Trans-Missouri Freight Association, 166 U. S. 290; United States v. Joint Traffic Association, 171 U. S. 1. c. 558), and by the United States Court of Appeals (United States v. Addyston Pipe & Steel Co., 54 U. S. App. 723), but the principles they announce have been expressly sanctioned by the Supreme Courts of New York (People v. Sheldon, 139 N. Y. 251), of Pennsylvania (Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173), of Ohio (Central Ohio Salt Co. v. Guthrie, 35 Oh. St. 666), of Kentucky (Anderson v. Jett, 89 Ky. 375), of Iowa (Chapin v. Brown Bros., 83 Ia. 156), of Illinois (Craft v. McConoughy, 79 Ill. 346, More v. Bennett, 140 Ill. 69), of Wisconsin (Milwaukee Masons and Builders' Association v. Niezerowski, 95 Wis. 129), of California (Vulcan Powder Co. v. Hercules Powder Co., 96 Cal. 150), of Texas (Texas Standard Oil Co. v. Adoue, 83 Tex. 650), and of Louisiana (India Bagging Assn. v. Keck & Co., 14 La. Ann. 168).

There is no more merit in this contention that there would be that a law was unconstitutional which prohibited two or more persons from conspiring to commit murder, or burglary or any other felony. There is no such thing in civilized society as the unrestrained power to contract. Every man surrenders some of his individual rights when he associates with or becomes a part of any society or government, and the power of the government to legislate is complete, so that while according to every man the fullest possible liberty to do what he pleases with his own, he must not interfere with the similar right of others. This principle underlies and runs through all governments and societies,, and it is the corner stone of the police power of the State.

3d. It is contended that section 1 of the Act is in violation of section 1 of the 14th amendment to the Constitution of the United States which provides: "That no State shall deprive any person of life, liberty or property without due

process of law, nor deny to any person within its jurisdiction the equal protection of the laws," because it discriminates between foreign and domestic insurance companies, and because these defendants had, prior to the enactment of this law, complied with the laws of the State of Missouri, and "that said Act deprives them of the right to carry on their business in a manner fair and just among themselves and not in any manner injurious to any other person in the State, and that said Act deprives them of the right of making the necessary and proper contracts relating to the business of insurance."

Section 1 of the Act of 1897 makes no distinction between foreign and domestic insurance companies, but on the contrary expressly covers, "any corporation organized under the laws of this or any other State or country." So the postulate of this proposition is not true and hence the conclusion fails.

It is a misconception of the 14th amendment to the Constitution of the United States to suppose that any person acquires any vested rights by complying with existing police regulations or comity laws which can not be affected by subsequent changes in such regulations or laws. Such compliance is equally the duty of the citizen and the stranger, and both are treated alike by this section of the Act of 1897. Hence the protection which the Constitution of the United States affords has not been denied or abridged by the passage of this law. This is too plain to need the citation of authority to support it, and is fully illustrated in the cases hereinbefore referred to.

4th. It is insisted that section 6 of the Act of 1891 as amended by the Act of 1895, violates the 14th amendment to the Constitution of the United States, in that it discriminates between foreign and domestic companies by making the Act of the agent *prima facie* proof of the act of the company as to foreign companies, while such is not the case as to domestic companies.

It might be conceded for the purposes of this case that this section is void for this reason, but that would avail these defendants nothing, for this section is not involved in this case, and no *prima facie* presumptions are invoked by the Attorney-General or indulged in by the court. The case has been tried and submitted and will be decided just as any other case involving a question of fact is tried, and the defendants have been accorded every privilege and presumption in their favor that any litigant can have or is accorded in any other kind of a case—even more so, for the proceeding being penal in its nature, it is strictly construed, and its abuse or violation must be clearly proven. [State ex rel. v. Talbot, 123 Mo. 69.]

Aside from this, however, this section is clearly separable from the remainder of the Act, and if eliminated from it, the remainder of the Act,and particularly sections 1 and 6a,would constitute a sufficient law to reach and cover the offenses here charged, and this being the case it is wholly immaterial—in fact, a mere academic question—whether section 6 is or is not constitutional. [County Court of St. Louis Co. v. Griswold, 58 Mo. l. c. 199.]

5th. It is further argued that sections 9 and 10 of the Act violate the 14th amendment of the Constitution of the United States, because hey allow an attorney's fee of not less than $25 nor more than $500 to be taxed against defendants in such cases, while no such fees are taxable against defendants in ordinary cases.

What is said above as to section 6 applies to this contention with equal force. Besides, no such question, claim or demand is set up in this case, and it will be time enough to consider it when a proper case involving such a claim is presented. A decision, in this case, of that proposition, might well be regarded as *obiter dictum*.

We have thus at great length set out the facts and circumstances disclosed by the record and the evidence, examined and

reviewed the law bearing upon the case, and with a lively appreciation of the effects and consequences to the seventy-three defendants, have reached the only conclusion which is possible on the facts under the law, that the defendants are guilty of the offense charged against them of deliberately forming a trust to fix and maintain the price or premium to be charged and paid for insurance against loss or damage by fire, lightning and storm, contrary to the provisions of the laws of this State, and having reached this conclusion, it only remains to pronounce and enforce the penalty which the law has fixed and prescribed in such cases.

The judgment of the court is that the defendants be ousted of all rights, privileges and franchises conferred by the laws of this State and of their certificates to do business under the insurance laws of this State, and that they pay the costs of this proceeding, and that execution issue therefor.

As before indicated, the evidence does not show that the Newark Fire Insurance Company, Norwalk Fire Insurance Company, London Assurance Corporation, Citizens' Insurance Company of New York, Union Insurance Company of Philadelphia or Equitable Fire and Marine Insurance Company of Providence, R. I., or their agents, were members of the Underwriters Social Club of St. Joseph, but as they have made common cause with the other defendants by the pleadings and joint answer, they will be treated in the same way as the other defendants and the judgment of ouster will include them. BURGESS, SHERWOOD and BRACE, JJ., concur in all the opinion, GANTT, C. J., and ROBINSON, J., concur in all except the judgment as to the five companies specified in the last sentence, and dissent as to that. VALLIANT, J., dissents.

GANTT, C. J. (*Dissenting*).—Concurring with my learned brother that the relator failed to establish by the testimony that five of the defendants or their agents were guilty of the charges against them in the information I am wholly unable to agree to his conclusion that because they challenged the

constitutionality of the statute under which they are prosecuted in common with their confederates, that they should for that reason be held to have confessed the allegations of the information.

As I understand the law, each defendant is liable only when it is shown to have been a party to the trust.

The fact that it was sued in common with others and filed a joint answer denying its liability, and also the constitutionality of the act, does not amount to a plea of confession and avoidance. I regard this part of the opinion and the conclusion against them as a radical departure in the construction of pleadings, and hence I dissent.

ROBINSON and VALLIANT, JJ., concur with me in these views.

VALLIANT, J. (*Dissenting*).—I entirely agree with the majority of the court in the opinion that the acts charged in the information constitute an offense against the anti-trust statutes of this State, and I also agree that these statutes are constitutional and valid. I further agree that if the agents through whom the respondents have conducted their business in this State have been guilty of the offense charged in the information the respondents can not escape the condemnation of the law on the plea that they did not authorize or were ignorant of the unlawful conduct of their agents. But the evidence in my opinion is not sufficient to convict them of the offense charged.

It is shown by the evidence that the local agents of the respondent corporations were associated together in an organization called the Underwriters' Social Club, which was in its general character more of a business than a social society, though it was not devoid of the latter characteristics. In weighing the evidence the name of the society adopted falls rather into the side of the scales against the respondents, because it seems to indicate to that extent an intention to mislead. But it appears that that club was the successor of one

that had for its purpose, or at least for one of its purposes, the maintaining of certain rates of premiums which, whatever its legal status might have been before, became when the anti-trust statutes were adopted, unlawful, and in organizing the new society it may be that the members in choosing this name only desired to distinguish it, as far as a mere name could do so, from its predecessor, of which one Lancaster was the active officer.

A great deal of testimony is devoted to what is called the Fetter book and the use made of that book by the respondents. The author of the book is W. J. Fetter, an insurance expert of fifty years' experience. It is published on his own account, and sold to all insurance companies who will buy. The general purpose of the book is to indicate to the insurer the rate of premiums to be charged for insurance on the various classes of property in the locality, and to classify the property. According to the evidence these rates are estimated from data derived from surveys and maps of the city drawn with special reference to furnishing information to the insurers as to the nature of the risk, and from personal inspection of the property, and are calculated by an experienced actuary. It is a book of technical information for all persons interested in that business and is estimated in value like all technical works in proportion to its reputation, or in proportion to the reputation of its author. When used and relied upon the effect is that the insurance agent writes a policy without making a personal inspection and survey of the property, and the book being not only in the hands of the local agent but also in the home office of the company, the latter may pass on the policy without a special survey and certificate of inspection. The evidence shows that the book is in extensive use and that a large proportion of the business of the respondents in St. Joseph during the period covered by this inquiry was based on the rates given in the Fetter book.

There is nothing unlawful in the character of the book,

and nothing unlawful in the insurance companies basing their business ventures on the information it contains, and even if the evidence showed that all their business was transacted on that basis, that would not of itself bring them under the condemnation of the law. The use that a fire insurance company, standing alone, may see fit to make of the book, is no more to be condemned than the use that a merchant may make of the daily price current reports or than that which a life insurance company may make of the tables of experience and of the prices at which such an insurance may be safely carried, compiled and computed by reputable authors and actuaries.

But there is a use to which the book might be put that would be unlawful, and that is the use to which it is charged in the information these respondents have put it, that is, that they have made it a standard of rates by agreement among themselves which shall not be lowered.

The evidence shows that before the anti-trust statutes were enacted there was a compact to maintain those or similar rates, and it shows that this so-called Social Club was organized just after that law went into effect and the organizers had that law very much in mind. There was testimony in support of the information tending to show that whilst the ostensible object of the society was innocent, its real object was to violate the law. But on the other hand, whilst the testimony of the respondents was weak in support of the idea of its being a social club, yet it very satisfactorily showed that its main object was the regulation among themselves of the insurance business transacted by its members in particulars in which their mutual convenience was promoted, the public interest not prejudiced and the law not violated.

The testimony in support of the charge of the unlawful agreement to maintain rates is chiefly that of two witnesses who were, or had been, members of the club, and between whom and the other members there seems to have arisen some unpleasant feeling growing out of their business. Whilst both

of these witnesses testify that there was such an unlawful agreement, yet they state it rather as their conclusion; their understanding of a tacit agreement. They say that no writtten agreement to that effect was made and they do not state what if anything the members said among themselves that would constitute such an agreement. They undertook to give what they said the president said at the organization which was, in substance, that they could not put anything in writing that would lay themselves liable to prosecution under the anti-trust law, and that whatever was done on the subject of maintaining rates would have to be understood among the members. One of these witnesses said that if a member wrote a policy below the Fetter rate, the secretary would send it back to him and he would be required to take it up; when the witness was asked what would happen if the member failed to take up the policy, he said that usually there would be a big row and a whitewashing; when asked to state an instance in which a member had been thus disciplined, he was able to remember but one, and that he so vaguely stated that it did not clearly appear either that the member had violated the supposed rule or that any penalty followed. Another one of these witnesses testified that there was a penalty prescribed for cutting the rate which was a fine of $50 for the first two offenses and after that loss of his agency. On cross-examination he said that the agreement to submit to that $50 fine was in writing signed by all the members of the club. That is in contradiction of his own previous statement and that of the other witness just mentioned, to the effect that no agreement on that subject was reduced to writing for fear of the law.

The evidence showed that the club had a secretary whom it paid $75 a month. This secretary had been obtained by a committee sent by the club to Kansas City to consult Mr. Fetter on the subject, and was recommended by him as an efficient man for their business, he having been a clerk in Fetter's office. All policies written by the members, and their daily

reports were sent to the secretary who examined them, and if the policies were found correct he forwarded them to the company, if anything wrong was discovered, either in the policies or reports, he sent them back to the agent for correction.    The State's testimony tended to show that this was for the purpose of preventing any agent from cutting the rate.    The testimony for respondents tended to show that the secretary was selected because of his skill in insurance business and to aid the members in their technical work; all policies were sent to him for his judgment as to their being properly written; if there was anything wrong in the form of the policy, or in the description of the property, it was his duty to note the correction and return it to the writer; when a number of policies were written by different agents on the same property it was desirable that they should all be what in technical language they call "concurrent," that is substantially in the same from; it was the secretary's duty to see that such policies were concurrent, and if one was found to be what they call "non-current" his duty was to note the difference and return it to the writer for correction; this could be done only by having a common agent of this kind or by the more inconvenient method of a meeting of all the agents interested; in a few instances when he first began his office, the secretary noted on policies that they were written below the rate indicated in the Fetter book, which was the usual standard, and returned them to the writers for such action as they might see fit to take, but it was done as a mere suggestion, the secretary took no further action on it, and he soon discontinued doing so; that he had nothing to do with fixing or maintaining the rates; that he made inspections of risks and when a change in the property or occupancy occurred he reported it to Mr. Fetter at Kansas City, who, if in his opinion the change required it, prepared for distribution to all his subscribers slips indicating a change in the rate of premium that should be made.

The testimony of the president, secretary and several members of the club was taken and they all testify that there was no agreement to maintain rates.

It is not every association of men engaged in the same business that is condemned by our anti-trust statutes, even though the object of the association be to facilitate the conduct of their business and promote their mutual interests. Such associations are not unusual nor necessarily injurious to the public well being. It was pointed out by witnesses in this case that there are features of the insurance business which render an association of the kind in question convenient and profitable to men engaged in the business, and that such an association may be conducted without in any particular violating the law.

The fact that before the anti-trust laws were enacted insurance companies were banded in an association to maintain rates doubtless conduces to place any society they may now form under suspicion, especially at a period when the public mind is excited on the subject of trusts. But when there is a legitimate purpose for which they may organize, and when we are told by reputable witnesses that such was the purpose of this organization and that there was no agreement to maintain rates, we have no right to disregard the testimony or overweigh it with suspicion.

I have given the evidence in this case a careful study and am satisfied that on the main question of fact the decided preponderance is in favor of the respondents, and the finding should be that they are not guilty of the acts charged and the judgment that they be discharged.