STATE, Respondent, v. FULLERTON LUMBER CO. et al., Appellants.

(152 N. W. 708.)

(File No. 3567.    Opinion filed May 24, 1915.    Rehearing denied July 24, 1915.)

1.  Indictment and Information—Indictment, Finding of at Special Term—Power of Judge to Call Term, and Grand Jury, on His Own Motion—Constitution and Statutes.

    Where an indictment was returned by a grand jury called by order of the presiding judge of the circuit court, who had called a special term on his own motion, such indictment was authorized and legal, under Const., Art. 5, Sec. 28, providing that special terms of the circuit courts may be held under such regulations as may be provided by law, and under Pol. Code, Sec. 661, vesting power in the circuit courts, on their own motion, to appoint by order, and hold, terms in any county or subdivision, which terms shall in all respects be considered the same as regular terms; and the failure of Code Cr. Proc., Sec.

162, as amended by Chap. 92, Laws 1905, authorizing the presiding judge of the circuit court to make an order calling a grand jury, whenever it appears to his satisfaction that the body is either necessary or desirable, to require, or to provide a method of giving, notice of the dates of special terms, does not render void the proceedings had therein; the effect of the statute being to make it the duty of such judge to order such term whenever, in his judgment, the administration of justice requires the holding of such term.

2. Indictment and Information—Indictment, Name of Defendant Omitted from Title of, From Body of, Effect—Statutes.

The fact that the name of one defendant was omitted from the title of the indictment, though his name appeared in the body therof as a defendant, or that the name of another defendant was omitted from one place in the body of the indictment where other defendants were named, although appearing as a defendant in the title of the cause and also at another place in the body of the indictment, did not vitiate the indictment on appeal, under Code Cr. Proc., Secs. 221, 222, requiring that an indictment must contain names of parties and that it must be true and certain as to the party charged; in view of Sec. 230, providing that no indictment is insufficient by reason of defect or imperfection in form which does not tend to prejudice the substantial rights of defendant upon the merits. **Held,** further, that, under Sec. 273, providing for taking advantage of defects appearing on the face of an indictment by demurrer, and Sec. 280, providing that certain formal defects appearing on the face of the indictment shall be deemed waived, unless objection be taken thereto by demurrer, the defendants who are shown to have plead not guilty upon arraignment, and not to have demurred thereto, are precluded from raising such objections at the trial.

3. Monopolies—Conspiracy to Prevent Trade Competition—Indictment for—Overt Act, Necessity for—Statute.

An indictment, under Laws 1909, Ch., 224, prohibiting the forming of combinations or agreements to prevent or obstruct competition in the purchase or sale of any commodity within this state, need not allege an overt act on the part of the defendants pursuant to the unlawful combination or agreement alleged to have been entered into by them; Pen. Code, Sec, 231, providing that no agreement, except to commit certain felonies therein specified, amounts to a conspiracy, unless some act besides the agreement be done to effect it, by one or more of the parties thereto, being inapplicable, since the law under which the indictment was drawn was enacted wholly independent of, and without reference to, existing laws relating to conspir-

acies; hence it was not incumbent on the state to prove an overt act of the defendants pursuant to such conspiracy, the offense being complete when the agreement is entered into.

4.    Same—Conspiracy to Prevent Competition—Indictment—Fixing Uniform Price Schedules—Necessity of Allegation of Combination With Other Dealers.

Where an indictment, under Laws 1909, Ch. 224, prohibiting conspiracies in restraint of trade, alleged that the corporate defendants were engaged in selling the same commodities at the same place, and that the corporations and their manager. defendants entered into an agreement that, where they met with outside competition, they could sell at the minimum or cost price fixed by them, but where they were without competition from other parties they would sell at the maximum price so fixed, allowing a large and substantial profit, held, that such indictment charged an offense under the act, and covered the mischief at which the statute aimed; and it was not necessary that the conspiracy should refer to any other dealers than the defendants themselves.

5.    Same—Conspiracy to Restrain Trade—Corporate Defendants— Agency of Corporate Managers—Indictment, Necessity of Allegation of Agency.

In a prosecution against a corporation and their managing and other agents, for violation of Laws 1909, Ch. 224, prohibiting agreements in restraint of trade, where it is alleged that the corporations themselves entered the unlawful combination, held, it was not necessary to allege that the individuals acting as agents of the corporations were authorized by them to make such agreements.

6.    Criminal    Law—Error—Evidence—Leading    Questions—Judicial Discretion.

A trial court is vested with reasonable discretion in allowing leading questions, notwithstanding that, as a general rule, they are objectionable and ought not to be allowed, except as to merely preliminary or introductory matters; and their allowance is not necessarily error; and where it is not apparent that discretion has been abused, or shown to have resulted in prejudice to the party complaining, the ruling of the trial court will not be disturbed.

7.    Criminal Law—Agreement to Restrain Trade—Evidence—Declarations and Conversations Before or After Agreement, Admissibility of.

In a prosecution against corporate and individual defendants for violation of Laws 1909, Ch. 224, prohibiting conspiracies in restraint of trade, the admission in evidence of conversations and declarations of individual defendants, made before or after

the agreement complained of was made, and leading up to the
making thereof, or tending to corroborate evidence that such
agreement had been made, was proper; the agreement itself
being made up of conversations between the parties, and it
therefore being necessary to bring out the whole of said con-
versation in order to ascertain the meaning of what was said.

8.    Same—Agreement to Restrain Trade—Evidence—Proof of Other
      Agreements, Competency of.

In a prosecution against corporate and individual defendants,
under Laws 1909, Ch. 224, prohibiting conspiracy in restraint of
trade, evidence, not susceptible of separation, in the way of con-
versations between the various parties to the agreement, tend-
ing to prove that agreements other than the one complained of
were made, was not incompetent as proving such other agree-
ments, because it tended to prove that the combination would
injure or destroy the business of a competing company; since
such evidence only went to show that the purpose of the com-
bination was to deprive the public of defendants' competition
among themselves, as well as any competition whatever.

9.    Conspiracies—Monopoly—Restraint of Trade—Agreement—Ab-
      sence of One Co-defendant, Materiality of.

In a prosecution against corporate and individual defendants,
under Laws 1909, Ch. 224, prohibiting conspiracies in restraint
of trade, held, that the fact that one of the individual co-de-
fendants was not present at the meeting at which the illegal
schedules of prices were prepared and agreed on, is not mater-
ial, since, if it were proved that he was informed of the agree-
ment and acted with other defendants in carrying out the plan
adopted at such meeting, he was equally guilty with them.

10.   Criminal Law—Evidence—Cross-examination of Witness, Lat-
      itude of—Collateral Matter—Prosecution Against Witness—
      Discrediting Witness, Admissibility.

In a prosecution against corporate and individual defendants,
under Laws 1909, Ch. 224, prohibiting conspiracies in restraint
of trade, where the chief witness for the state was a former
partner of one of the corporate defendants, held, that evidence
as to the details of a prosecution for embezzlement from one
of the corporate defendants, pending against the witness, was
properly refused, such evidence being wholly collateral to the
issues, and the fact of such prosecution itself being admissible
only to discredit the witness.

11.   Monopolies, Combination by Corporations to Restrain Trade—
      Authority of Managing Agent, Necessity of Proving—Statute.

In a prosecution against corporate and individual defendants
under Laws 1909, Ch. 224, prohibiting conspiracies in restraint
of trade, held it is not incumbent upon the state to prove that

the individual defendants through whom the agreement complained of was entered into, acted pursuant to authority from such corporations, or that the agreement had been ratified by them; it is sufficient to show that such agents were in fact in control of said businesses; since, otherwise, the state would be required to produce evidence that would rarely exist, except in possession of or under control of the defendant corporations, and which, under constitutional provisions, they could not be required to produce; and such a rule of construction of the statute would enable corporations to violate its provisions with immunity.

12.   **Criminal Law—Instructions—Accomplice, Corroboration of— "Corroborated," Sufficiency.**

In a prosecution against corporate and individual defendants under Laws 1909, Ch. 224, prohibiting conspiracies in restraint of trade, an objection that offered instructions, concerning corroboration of testimony of an accomplice are, although proper, refused, is unavailing where the court, on its own motion, instructed that, in order to convict upon the testimony of an accomplice, he must be corroborated by such other testimony as tends to connect the defendant with the commission of the offense and not merely to show the commission of the offense or the circumstances thereof, and that to "corroborate" means to strengthen or confirm by other evidence tending to so connect, etc.

13.   **Same—Evidence—Testimony of Accomplice—Corroboration, Sufficiency—Statute.**

In a prosecution against corporate and individual defendants, under Laws 1909, Ch. 224, prohibiting conspiracies in restraint of trade, held, that evidence by way of corroboration of the testimony of an accomplice, necessary to sustain a conviction, as contemplated by Code Cr. Proc., Sec. 364, need only be such as tends to connect defendants with the commission of the offense charged; that this does not mean evidence that would support the verdict without the testimony of the accomplice, but only such as supports or strengthens it; that, tested by this rule, there was sufficient evidence, aside from that of the accomplice, to warrant conviction.

14.   **Criminal Law—Trial—Instructions—Reading Statute and Title Thereto.**

In a prosecution against corporate and individual defendants, under Laws 1909, Ch. 224, prohibiting conspiracies in restraint of trade, held, that the reading of the applicable section of said act and the title thereof, by the court to the jury, was not erroneous as conveying the impression that the statute was enacted for the purpose of punishing the particular defendants engaged in a particular business.

15.  **Criminal Law—Trials—Instructions—Degree of Proof—"Reasonable Doubt"—Statute.**

An instruction that the "reasonable doubt" meant by Code Cr. Proc., Sec. 356, entitling an accused person to acquittal, was a doubt of guilt reasonably arising from the evidence, facts, and circumstances in the case, and that proof is beyond a reasonable doubt when the evidence is sufficient to impress the judgment of ordinarily prudent men with a conviction under which they would act without hesitation in their own most important affairs of life, that such a doubt has some reason for its basis, that it does not mean a mere possibility that might or could be suggested or imagined without a desire to arrive at the truth, or some mere groundless conjecture, that it is a doubt for which the jury are able to give a reason under the evidence, **held**, not erroneous as specifying to the jury what was required to justify acquittal without specifying what was required for conviction, or as discrediting the rule requiring proof of guilt beyond reasonable doubt.

16.  **Monopolies—Conspiracies to Restrain Trade—Directing Verdict—Sufficiency of Evidence—Statute.**

In a prosecution against corporate and individual defendants under Laws 1909, Ch. 224, prohibiting conspiracies in restraint of trade, **held**, the evidence was sufficient to warrant conviction, and the action of the trial court in refusing to direct verdict for defendants was justified, as against the objection that there was no evidence to connect each defendant with the commission of the offense charged.

17.  **Criminal Law—Judgment of Conviction—Recital of Expenses of Trial, Effect of on Judgment.**

In a prosecution for criminal conspiracy, **held**, the judgment was not void because it contained a recital showing the amount of expenses incurred by the county in the prosecution of the case; that, while such recital has no proper place in the judgment, appellants were not injured thereby.

Appeal from circuit Court, Turner County. Hon. ROBERT B. TRIPP, Judge.

The Fullerton Lumber Company and others, defendants, were convicted of a violation of Laws 1909, Chapter 224, Prohibiting conspiracies in restraint of trade, and they appeal. Affirmed.

*John E. Tipton, Bogue & Bogue, French & Orvis,* and *Spangler & Haney,* for Appellants.

*Royal C. Johnson, A. B. Beck,* and *Edward E. Wagner,* for Respondent.

(1) Under point one of the opinion, Appellants cited: Const. Art. 5, Secs. 27, 28; Pol. Code, Sec. 661.

Respondent cited: Benedict v. Ralya, 1 S. D. 167; Meyer v. Mitchell, 1 S. D. 249; In re Nelson, 19 S. D. 214; Const., Art. 5, Secs. 27, 28, 33; Pol. Code, Sec. 661; Laws 1905, Ch. 92.

(2) Under point two of the opinion, Appellants cited: Code Cr. Proc., Sec. 221; Laws 1913, Ch. 242.

Respondent cited: Code Crim. Proc., Secs. 221, 222, 229, 230, 263, 264, 272, 280; State v. Maldonado, (Wash.) 59 Pac. 489; Curtley v. State, 59 S. W. 44 (Tex.); People v. Olivera, 59 Pac. 772( Calif.) People v. Villarino, 5 Pac. 154( Calif.); People v. Biggins, 4 Pac. 570 (Calif.); People v. Chuey Ying Git, 34 Pac. 1080 (Calif.)

(3) Under point three of the opinion, Appellant cited: Code Crim. Proc., Sec. 231, 363.

Respondent cited: Nash v. United States, 229 U. S. 373, 57 L. Ed. 1232.

(6) Under point six of the opinion, Appellants cited: State v. Hazlett (N. D.) 105 N. W. 617.

(7) Under point seven of the opinion, Appellants cited: 3 Ency. Ev. 429; People v. Molineux, 62 L. R. A. 193 and note.

Respondent cited: Williamson v. U. S., 207 U. S. 425, 52 L. Ed. 278; Holmes v. Goldsmith, 147 U. S. 150, 37 L. Ed. 118; Richards v. U. S., 175 Fed. 911 (8th C. C. A.); Smith v. Bank, (N. H.) 54 Atl. 385; Hallock v. U. S. 185 Fed. 417, 424.

(8) Under point eight of the opinion, Respondent cited: Jones v. U. S., 179 Fed. 584-610 (C. C. A.); Heike v. U., S. 227 U. S. 131, 57 L. Ed. 450; Marrash v. United States, 168 Fed. 225, C. C. A.

(9) Under point nine of the opinion, Respondent cited: Radin v. United States, 189 Fed. 568( 2d C. C. A.)

(10) Under point ten of the opinion, Appellants submitted that: It was error to allow the defendants to inquire of the witness Claude Smith when the prosecution against him for embezzlement was begun. It was important that the jury should know whether Smith was prosecuted for being a witness or whether he was a witness because of having been prosecuted.

(11) Under point eleven of the opinion, Respondent cited: State v. Freeman's Fund Insurance Co., (Mo.) 45 L. R. A.

363-374, see opinion page 374; United State v. Addystone Pipe Company, 85 Fed. 282; United States v. Addystone Pipe Company, 175 U. S. 225, 44 L. Ed. 142.

(12) Under point twelve of the opinion, Appellants cited: Code Crim. Pro., Sec. 364; State v. Hicks, 6 S. D. 325; State v. Levers, 12 S. D. 265.

(17) Under point seventeen of the opinion, Appellants cited: Laws 1909, Ch. 224, Sec. 6; Casseday v. Robertson, (N. D.) 125 N. W. 1045.

Respondent cited:    Harlan v. Megourin, 218 U. S. 442, 54 L. Ed. 1101; United States v. Pridgeon, 153 U. S. 48, 38 L. Ed. 631; Re Bonner, 151 U. S. 242 at page 259, 38 L. Ed. 149.

POLLEY, J.    The defendants in this action were indicted under the provisions of chapter 224, Laws of 1909. The Fullerton Lumber Company, J. H. Queal & Co., and the Floete Lumber Company are corporations, and, at the time of filing the indictment, were engaged in selling lumber, coal, and building material, at Geddes, S. D.    The defendants Kramer and Mahaney were the agents and in the employ of the Floete Lumber Company. L. C. Kroh and F. S. Vaughn were the agents and in the employ of J. H. Queal & Co., and O. G. Meyer, R. C. Turner, and James Jordan were the agents and in the employ of the Fullerton Lumber Company. The indictment charged that on the 14th day of October, 1910, the defendants—
"did willfully, unlawfully and wrongfully combine, have an understanding, and make an agreement, with and among themselves, to fix the prices of the commodities aforesaid within the state of South Dakota, and did then and there, mutually agree among and between themselves to obstruct and prevent competition in the sale of the commodities aforesaid by wrongfully agreeing to fix the prices to be charged to the general public for said commodities by each and every one of the said defendants and did then and there adopt a schedule of prices to be charged the general public for the commodities aforesaid, and did, thereby bind themselves together and agree to charge a uniform price for the said commodities to the general public; that is to say, that while said corporations were engaged in business as aforesaid, and the said Nicholas J. Kramer and Pat Mahaney were agents,

and in the employ of said Floete Lumber Company and carrying on its said business, and the said F. S. Vaughn and L. C. Kroh were the agents and employees of said J. H. Queal & Company in the management of its said business, and the said R. C. Turner, James Jordan and O. G. Meyer were the agents and employees of the Fullerton Lumber Company in the management of its said business, the said defendants did, at the time and place and in the manner aforesaid, mutually arrange and agree among themselves to, and did thereby, make and adopt certain schedules of prices, or price lists, at which they would then and thereafter sell said commodities to the public, to-wit: a maximum and minimum schedule of prices, or price lists; that is to say, one schedule or price list fixing a high or maximum price at which the defendants would sell said commodities to the public when there were no other competitive dealers bidding or competing therefor, such prices being intended by the defendants to represent, and actually representing, a large and substantial profit to the defendants in the sale of said commodities; and another, or minimum schedule, or price list, fixing the minimum price at which the defendants would sell such commodities when other competitive dealers should submit bids and enter into competition with the defendants therefor, said minimum schedule of prices representing the actual cost price of said commodities at said city of Geddes, to the defendants and other dealers in such commodities; the same to be sold by the defendants at such minimum prices only when such other competitive dealers should submit bids and enter into competition with the defendants for the sale thereof; said defendants intending by the said schedule of prices, or price lists, to sell such commodities at said maximum prices, and for a large and substantial profit to themselves, when other dealers should not compete with them therefor, and to compel such competitive dealers to sell said commodities at cost, or without profit, when such competitive dealers should submit bids and enter into competition with the defendants therefor; the defendants then and there wrongfully agreeing to fix the prices at which said commodities should be sold, so as to obstruct and prevent competition in the sale thereof within said county of Charles Mix and in the state aforesaid. * * *"

To this indictment each of the defendants entered a plea of "not guilty," and, upon their application, the cause was transferred to Turner county, where a jury was impaneled and a trial had. At the close of the trial, the case was dismissed as to defendant Kramer, and, as to defendants Floete Lumber Company and Turner, the court advised a verdict of not guilty, and they were acquitted. The other defendants were convicted. A motion for a new trial was granted as to defendant Mahaney, but was denied as to the defendants Fullerton Lumber Company, J. H. Queal & Co., L. C. Kroh, O. G. Meyer, James Jordan, and F. S. Vaughn, and they bring the cause here on appeal.

The record on appeal contains something over 100 assignments of error, which, so far as is necessary to a determination of the case, will be taken up in their order.

[1] It appears, from the record, that the indictment in this case was returned at a special term of the circuit court, called by the presiding judge of the circuit, upon his own motion. Appellants contend that this was beyond the authority of such judge, and that, for that reason, the proceedings had at such term of court, including the presentation of the indictment, are void. In view of the constitutional and statutory provisions, and what has already been said by this court upon the subject of holding special terms of court, this contention does not merit serious consideration. By section 28 of article 5, Const., which relates to the holding of terms of circuit courts, it is provided that:

"Special terms of said courts may be held under such regulations as may be provided by law."

And section 661, Rev. Pol. Code, reads as follows:

"The judges of the circuit courts, respectively, shall have power, whenever thereunto a request be made by the board of commissioners of the counties wherein terms of courts are regularly holden, or upon their * * * motion without such request, by an order to that effect, to appoint and hold terms of the circuit court in any county or subdivision, and the terms of court as in this article provided shall continue as long as the business therein shall require, and the judges thereof shall have power to adjourn such courts from time to time as they shall deem expedient for the due administration of justice; and such

adjourned terms shall in all respects be considered the same as the regular terms, as in this article provided for."

The effect of this statute is to vest in the circuit judge broad discretionary powers in the matter of holding special terms of court. Upon the request of the board of county commissioners, he may order a special term to be held; or he may do it upon his own motion without such request. No attempt is made to specify the circumstances under which he may act upon his own motion, and the effect of the statute is the same as though it in terms provided that whenever, in the judgment of the presiding judge of the circuit, the administration of justice requires the holding of a special term of court, it becomes his duty to order that such term be held.

It is true that the law does not require, nor provide a method of giving, notice of the dates of special terms of court, but this by no means renders void the proceedings had at such term of court. Failure to give notice of the time of holding such term of court could not prejudice the rights of any one who had actual notice and was present in court, as these defendants were, and the court has ample power to afford relief to those whose rights may have suffered through lack of notice. In re Nelson, 19 S. D. 214, 102 N. W. 885. It is our conclusion that the presiding judge was acting within his constitutional and statutory powers when he convened the special term of court at which defendants were indicted; and, when the court was so convened, it was in session for all matters that might properly come before it.

Section 162, Rev. Code Cr. Proc., as amended by chapter 92, Laws of 1905, authorizing the presiding judge to make an order calling a grand jury, whenever it appears to his satisfaction that a grand jury is either necessary or desirable. It is not claimed in this case that a proper order calling the grand jury that indicted appellants was not made, and we hold that such jury was properly and legally called.

[2] Through mistake or oversight, the name of the defendant O. G. Meyer was omitted from the title of the cause in the indictment in the case, though his name appears in the body of the indictment as one of the defendants; and, through mistake or oversight, the name of James Jordan was omitted from one place

in the body of the indictment where the other defendants are
named, although his name appears as a defendant in the title of
the cause, and also at another place in the body of the indictment.
Because of these omissions, these two defendants objected to the
trial proceedings as against them, and now contend that they are
not included as defendants in the case, that it cannot be said, from
the indictment, that the grand jury intended to make them parties
to the action, and that, as to them, such omissions are fatal to the
indictment.   This contention is based upon the provisions of sec-
tions 221, 222, Rev. Code Cr. Proc.   Section 221 provides that:

"The indictment or information must contain:   1. The title
of the action, specifying the name of the court to which the in-
dictment is presented, and the names of the parties.   2. A state-
ment of the acts constituting the offense, in ordinary and concise
language, and in such manner as to enable a person of common
understanding to know what is intended."

And section 222 is as follows:

"The indictment and information must be direct and certain,
as it regards:   1. The party charged.   2. The offense charged.
3. The particular circumstances of the offense charged, when they
are necessary to constitute a complete offense."

While the above provisions appear to be mandatory, the de-
fects complained of are not fatal.   By section 230 it is provided
that:

"No indictment or information is insufficient, nor can the
trial, judgment or other proceedings thereon be affected, by rea-
son of a defect or imperfection in matter of form, which does not
tend to the prejudice of the substantial rights of the defendant
upon the merits."

It is not contended by either of these defendants that their
substantial rights are in any wise prejudiced by the omissions
complained of, but, if they were, their objection came too late.
Section 263 specifies certain grounds, which do not include the
defects complained of here, upon which the indictment or infor-
mation may be set aside by the court.   By section 273, where the
defect complained of appears on the face of the indictment or
information, it may be taken advantage of by demurrer; but, by
section 280, all such objections, except that to the jurisdiction of
the court over the subject of the indictment or information,

or that the facts stated do not constitute a public offense, are deemed to be waived unless taken by demurrer. From an examination of the indictment, it cannot be doubted that the grand jury intended to charge Jordan and Meyer with the other defendants, and that they so understood it is manifest from the fact that, when arraigned, they entered a plea of not guilty to the indictment, without objection to the sufficiency thereof. The defects complained of appear upon the face of the indictment, and, the defendants not having demurred thereto, they were precluded from raising the question at the trial.

[3] It is claimed by appellant that the indictment in this case is fatally defective, for the reason that it fails to allege any overt act on the part of appellants pursuant to the unlawful combination or agreement alleged to have been entered into by them. This contention is based upon the provisions of section 231, Penal Code. This section reads as follows:

"No agreement except to commit a felony upon the person of another, or to commit arson or burglary amounts to a conspirarcy, unless some act beside such agreement be done to effect the object thereof, by one or more of the parties to such agreement."

Appellants contend that chapter 224, Laws of 1909, under which the indictment is drawn, does not define a new or independent offense, but is merely an addition to the existing law relating to conspiracies, and that it is controlled and modified by said section 231. With this contention we do not agree. Chapter 224 is modeled after the Federal Anti-Trust Law (Act July 2, 1890, c. 647, 26 Stat. 209), and was enacted wholly independent of, and without reference to, existing laws relating to conspiracies, and for the purpose of making acts, which, if applied to interstate trade or commerce, are an offense against the federal government, an offense against the state when they affect trade or commerce wholly within the state. The question here presented has recently been before the Supreme Court of the United States, in Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232—a case prosecuted under the Sherman Anti-Trust Act. The federal statute relating to conspiracies and overt acts to effect the object thereof is similar to our own; and, in considering the question here presented by appellants, that court said:

"Coming next to the objection that no overt act is laid, the answer is that the Sherman Act punishes the conspiracies at which it is aimed on the common-law footing; that is to say, it does not make the doing of any act, other than the act of conspiring, a condition of liability. The decisions as to the relations of a subsequent overt act to crimes, under Rev. State. § 5440, U. S. Comp. Stat. 1901, p. 3676, in Hyde v. United States, 225 U. S. 347, 32 Sup. Ct. 793, 56 L. Ed. 1114 [Ann. Cas. 1914A, 614], and Brown v. Elliott, 225 U. S. 392, 32 Sup. Ct. 812, 56 L. Ed. 1136, have no bearing upon a statute that does not contain the requirement found in that section. As we can see no reason for reading into the Sherman Act more than we find there, we think it unnecessary to offer arguments against doing so."

Chapter 224, Laws of 1909, was enacted for the purpose of prohibiting and preventing the forming of combinations or agreements to prevent or obstruct competition in the purchase or sale of any product or commodity within this state. The offense defined is complete when the combination or agreement is entered into. No overt act in furtherance of the unlawful combination is required, and, as was said in Nash v. United States, supra, there is no reason why the court should read into the act something not placed there by its authors.

[4] But it is contended by appellants that, assuming that the provisions of section 231, Code Cr. Proc., do not apply to said chapter 224, the indictment does not state facts sufficient to constitute a public offense. This question is to be determined by an examination of the indictment itself. After alleging that the three corporation defendants were engaged in selling the same identical commodities at the same place, it is alleged, in the language of the statute, that these corporations, together with the other defendants, entered into a combination, whereby they agreed upon a schedule of uniform prices at which they would sell their commodities to the general public. It is not necessary to decide whether the indictment, had it gone no further, would have been defective, for it goes on and sets out in detail the manner in which they proceeded, not ony to eliminate competition as between themselves, but to prevent any competition whatever. It alleges that defendants agreed upon and adopted two schedules or lists of prices. One of these lists of prices was enough, above

the cost of the commodities in which they were dealing, to allow a large and substantial profit thereon. The other list of prices represented the actual cost price of such commodities. Where defendants were without competition from other parties, they were to sell at the prices fixed by the higher schedule; but, where there was competition from third parties, then defendants were to sell at the prices fixed by the lower schedule of prices. This fully covers the mischief at which the statute is aimed, and it is difficult to suggest any thing further that would be necessary to constitute the offense created thereby.

It is not necessary that the agreement alleged to have been entered into by defendants should have had reference to any other dealer or dealers than themselves, and that the indictment charges that they entered into such agreement among themselves is admitted by appellants. In their printed brief, they say:

"Eliminating mere recitals, conclusions, and unnecessary repetition, the terms of the alleged agreement are as follows: That the defendants agreed upon a maximum price list, representing substantial profits at which each of them would sell to the public."

Such an agreement, if carried out, would prevent all competition between themselves, and this is sufficient to constitute the offense created by the statute.

[5] On behalf of the corporation defendants, it is contended that the indictment is fatally defective, because it contains no allegation that the individuals who formed the alleged combination were the agents of the said corporations or were authorized by them to make said agreements for or on their behalf. This is not material. It is alleged positively that the corporations themselves entered into the alleged unlawful combination. It must be assumed, of course, as a matter of law, that they could act only by or through agents, but whether such agents were authorized so as to bind such corporations is a matter of evidence rather than one of pleading, and it is not necessary to allege such authority in the indictment. Murphy v. C., M. & P. S. Ry. Co., 31 S. D. 475, 141 N. W. 380.

By far the greater number of appellants' asignments relate to alleged errors in the admission and exclusion of evidence by the trial court. Recognizing the impracticability of taking up and discussing this great number of assignments separately, they

have grouped them under the following heads and discussed them all together, viz.:

"(1) Permitting counsel for the state to propound leading questions to its principal witness, Claude Smith; (2) admission of irrelevant declarations and conversations made or occurring before and after the making of the alleged unlawful agreement; (3) declarations and conversations relating to other agreements than the one alleged in the indictment; (4) incompetent and irrelevant testimony and exhibits admitteed for the alleged purpose of showing performance of the agreement stated in the indictment; (5) testimony admitted for the alleged purpose of showing intent; (6) testimony admitted for the alleged purpose of showing that certain natural persons· knowingly became parties to the alleged agreement after it was made; and (7) refusal to allow proper cross-examination of the state's witnesses."

A comprehensive idea of the questions thus raised requires an extended statement of the facts as they appear from the testimony. It is conceded that for a considerable length of time before the making of the agreemnt alleged to have been made, to-wit, before the 14th day of October, 1910, each of the corporation defendants and the Farmers' Elvator Company was maintaining a separate place of business in Geddes, for the sale, to the general public, of lumber, coal, and building material. The Farmers' Elevator Company was under the management and control of one W. H. Menzie, who testified at the trial as a witness for the state. The witness Claude Smith was in the employ of the defendant J. H. Queal & Co. and acted as manager and foreman of its Geddes lumber yard and office from the 1st of January, 1910, until some time in the spring of 1912, when he was discharged. About the time of, or shortly after, his discharge, that company made a complaint against him, upon which a prosecution, charging him with embezzlement, was instituted. While in the employ of the said J. H. Queal & Co. he took part in whatever agreement or combination may have been entered into between the defendants and it was upon disclosures made by him that the prosecution in this case was instituted.

The testimony of Smith tended to show that, at and for some time after he took charge of J. H. Queal & Co.'s business, in January, 1910, an understanding had existed between the de-

fendant corporations (known as the line companies) whereby they were to maintain, and were maintaining, a uniformity of prices for the various commodities in which they were dealing, but that the Farmers' Elevator Company (known as the independent company) was competing in prices with the line companies, and that the line companies were anxious to eliminate such competition. With this object in view, the defendants held a meeting on the night of the 14th of October, 1910, at which they agreed upon two schedules or lists of prices for their various commodities. The prices fixed by one of these lists were high enough to produce a large profit to the defendants on the commodities sold. The other list of prices represented about the actual cost of said commodities at Geddes, and, of course, said commodities could be sold at or under this list of prices only at a loss to the seller. Defendants then agreed among themselves that, in all cases where they were not obliged to compete with the independent company, they would sell at the higher schedule of prices; but that, when they were obliged to compete with the independent company, they would sell at the lower schedule of prices. Each of the defendant corporations was furnished with a copy of these schedules and agreed to be goverened thereby in making sales in the future. Certainly a more vicious combination could not well be imagined, for, if put into execution, it would not only destroy the competing company but would deprive the general public who were obliged to use the commodities dealt in by those companies, of all competition in the prices thereof in the future. There was evidence to show that the defendant corporations operated under this agreement for a considerable length of time. The defendants denied having entered into any such agreement or combine, but, if the evidence on behalf of the state were competent, this presented only a question of veracity which was disposed of by the jury.

[6] Appellants contend that the trial court erred in overruling their objections to certain leading questions that were put to the witness Smith by counsel for the state. While, as a general rule, leading questions are objectionable and ought not to be allowed, except as to merely preliminary or introductory matters, their allowance is not necessarily error. The trial court is vested with a reasonable discretion in the matter of allowing such ques-

tions; and, where it is not apparent that this discretion has been abused or shown to have resulted in prejudice to the party complaining, the ruling of the trial court will not be disturbed. Ganow v. Ashton, 32 S. D. 458, 143 N. W. 383; Wigmore, Ev. §§ 770-772. Appellants cite and rely upon State v. Hazlett, 14 N. D. 490, 105 N. W. 617, in support of their contention, but there is little similarity between that case and this. In that case it was held that the trial judge abused his discretion in the matter of permitting leading questions by the court, and, in speaking of the record before it, that court said:

"Throughout the entire direct and redirect examination there was hardly a single question asked which did not directly suggest the answer desired, or which gave the witness an opportunity to state any of the facts in her own language.

No such condition is disclosed by the record in this case, nor does it appear that appellants were in any wise prejudiced by the rulings complained of.

[7] Appellants next contend that the court erred in the admission of irrelevant declarations and conversations made before and after the making of the alleged unlawful agreement, and declarations and conversations relating to other agreements than the one alleged in the indictment. It is true that some evidence relating to declarations and conversations that took place before and after the making of the agreement alleged in the indictment was admitted at the trial, but these were only such conversations and declarations as led up to the making of said agreements or tended to corroborate the evidence that such agreement had been made. It must be borne in mind that the alleged agreement was not reduced to writing and signed by the parties thereto. It was wholly oral. It was made up of conversations between the various parties entering into it. In order to ascertain the real meaning of what was said, it was necessary, so far as possible, to bring out the whole of said conversation. Matters may have been discussed or mentioned, during the course of such conversations, that were entirely unnecessary, or even foreign, to its main object, but still, being a part of such conversations, they were naturally brought out with the other parts thereof. The conversation resulting in the agreement was had in secret. That any such conversation ever took place was positively denied

by every one having any knowledge thereof, with the one exception of the witness Smith, and any conversation or declarations by the parties thereto leading up to such agreement, or anything in the nature of admission after it was made, that tended to establish its existence, were relevant and admissible for that purpose.

[8] Appellants are not borne out by the record in their assumption that there was evidence admitted for the purpose of proving, or tending to prove, other agreements than the one alleged in the indictment. It may be true that some of the conversation that was admitted tended to show that the alleged combination or agreement resulted in injury to the independent company, and it may be true that appellants intended to destroy the business of the independent company, but this only went to show that the purpose of the combination was to not only deprive the public of the benefit of competition as between the defendants themselves, which completed the offense defined by the statute, but to deprive the public of the benefit of any competition whatever. Evidence that is otherwise relevant and competent to prove the defendants entered into a combination to deprive the public of the benefit of competition as between themselves does not become irrelevant nor incompetent because it tends to prove that such combination would also destroy the independent company, and thereby deprive the public of the benefit of all competition. The evidence tending to prove the different offenses was not susceptible of separation, and, as it was necessary to throw light on the material facts charged, it was properly admitted.

The other assignments based upon the admission and exclusion of the evidence have been examined, but, as no prejudical error is made to appear, they need not be taken up in detail.

" ' The modern tendency, both of legislation and of the decision of courts, is to give as wide a scope as possible to the investigation of facts. Courts of error are especially unwilling to reverse cases because unimportant and possibly irrelevant testimony may have crept in, unless there is reason to think that practical injustice has been thereby caused.' " Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278.

[9] The fact that one of the defendants was not present at the meeting at which the schedule of prices were prepared and agreed upon is not material.  If it were proved that, when such absentee was informed of what had been done, he approved of the scheme agreed upon, and acted in concert with the other defendants in the execution of the plans adopted at such meeting, he was equally guilty with the other defendants.

[10] It is next contended that the appellants were not allowed proper latitude in the cross-examination of the witness Claude Smith.  The first assignment relating to this question is based upon the refusal of the trial court to permit appellants to go into the details of the prosecution for embezzlement pending against him at the time of the trial.  This matter was wholly collateral to any of the issues in this case, and was admissible only for the purpose of discrediting the witness.  The question put to the witness assumed that the prosecution against him was pending before this case was commenced, but he had not been tried nor convicted, and the jury had a right to draw their own inference as to the credibility of the witness without going into further detail.  The other questions asked in the course of the examination were clearly incompetent for any purpose, and were properly excluded by the court.

[11] Appellants next contend that it was incumbent upon the state to prove that the agreement or combination alleged to have been entered into at Geddes by the local managers of the defendant corporations had been formed pursuant to authority from such corporations, or that said agreement had been ratified by the corporations, and that:

"The jury should have been charged that the corporations could not be convicted unless actual authority was shown, beyond a reasonable doubt."

Of course, it requires no argument, nor difficult process of reasoning, to demonstrate to any one that such a construction of the statute, under which this case was brought, would amount to a complete nullification of the law.  To impose any such burden upon the prosecution would be to require the production of evidence that would rarely exist, except in the possession of, and under the control of, the defendants, and which, under the provisions of the Constitution, they could not be required to pro-

duce. Under such a construction of the law, foreign corporations could maintain their various business establishments within the state, and, by the aid of the mails, telegraph, and telephone, so direct their business and control their local managers as to carry on any kind of wrongful combination or trust that might please their fancy, and still remain absolutely immune from punishment under the laws of this state.

We do not feel disposed to adopt a rule that will produce or permit the above results. Corporations can act at all only by and through their agents, and where they are carrying on their business through such agents, with full opportunity for knowledge of the manner in which the business is being carried on, and are reaping the benefit of such business, they should be charged with knowledge of what is being done and be held responsible for the acts of such agents. Were the rule otherwise, corporations doing business within the state would be wholly beyond the control or regulation of the Penal laws of the state. In the prosecution of the insurance companies in the state of Missouri, the Supreme Court of that state said:

"The company can and must control its agents and must see, at its peril, that its agents do not violate the law while attending to the business of the company. This is the rule as to libels, assaults, malicious torts by agents of incorporated companies; and there is greater reason for it being the rule in cases involving the anti-trust laws. In fact, unless it was so, no company could ever be convicted of a violation of those laws, for they would do as the president of the social club said the club must do—put nothing in writing that would make them liable to prosecution, keep no records, leave no tangible evidences or tracks of their doings." State v. Firemen's Fund Ins. Co., 152 Mo. 1, 52 S. W. 595, 45 L. R. A. 363.

It is not necessary to hold that the traveling auditor of the corporation is, as a matter of law, merely, by reason of his employment as such auditor, authorized to bind his corporation by an agreement with another dealer respecting the prices at which the commodities in which they are dealing shall be sold. It is sufficient to know that he is in fact in control of such business. In the absence of anything to the contrary, he will be presumed

to be acting within the scope of his authority and to be carrying out the instructions and the policy of the corporation.

[12] At the proper time, the appellants requested that certain instructions prepared by them be given to the jury. These instructions were refused, and such refusal is made the basis of appellants' assignments, numbered 98 to 100, inclusive. These instructions related to the question of corroboration of the testimony of an accomplice. The evidence on behalf of the state consisted largely of the testimony of the witness Claude Smith. He, it will be remembered, was the local manager of the defendant J. H. Queal & Co., and, as a representative of that company, was present at, and took part in, the deliberations of the meeting where the unlawful combination was formed. He helped to prepare the schedules of prices that were agreed upon at that time, and afterward helped carry out the plans there formed. One other witness was similarly situated, though less active than Smith. While the requested instructions contained much repetition and went into greater detail and minutia relative to the subject than was necessary to a correct understanding of the subject by the jury, it correctly stated the law; and, had the court not covered the matter in portions of the instructions given on its own motion, the refusal to give the requested instructions would have constituted reversible error, but upon this subject the court charged the jury as follows:

"If you find from the evidence that that October, 1910, agreement was made and carried out as testified by the witness Claude Smith, he would be what in law is called an accomplice, and you should not convict any of the defendants on his testimony without its being corroborated. Our law upon this subject is this: 'A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof.' Notice now: 'A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof.' An ac-

complice, as you perhaps well understand, is an associate or companion in crime, so, under this section of law, his testimony you would have to find is corroborated; that is, strengthened or confirmed by other evidence in the case which would tend to connect the other parties, defendant or defendants in this case, with the commission of the offense. *. * * I have stated to you that if you find from the evidence, beyond a reasonable doubt, that that original October agreement was entered into, any person connected with it and in its execution would be an accomplice. So also would any other person, who, with full knowledge of its having been made, assisted in its being carried out, so that it obstructed or interfered with competition, as alleged in the indictment. Now, if you find that there is any other witness in this case who was not present but afterward came to a knowledge of the agreement, if you find there was one, and he likewise assisted in the execution of it; he also would be in the same position as Claude Smith, an accomplice, and his evidence would have to be corroborated in the same manner."

This, we think, was a sufficient explanation of the law to enable the jury to understand what was meant by corroboration and to act intelligently in the matter.

[13] But it is contended by appellants that there is no corroborating evidence in the record; that the witness Smith was an accomplice; that the conviction rests wholly upon his uncorroborated testimony; and that therefore the conviction cannot stand. It is true that Smith participated in all the unlawful acts alleged in the indictment. He appears to have entered into the scheme willingly, if not enthusiastically. His testimony covered the entire transaction, and, in the absence of the statute, is sufficient, if competent, to support the verdict. It is only a question, then, as to whether there is any other evidence than Smith's tending to connect the defendants with the commission of the offense charged. This does not mean evidence that would support the verdict without the testimony of the accomplice, but only such as supports or strengthens that of the accomplice. This question was discussed at length by this court in State v. Hicks, 6 S. D. 325, 60 N. W. 66, where the court stated the rule as follows:

"The corroborative evidence contemplated by this section (section 364, Code Cr. Proc.) is not necessarily such evidence as will

of itself support a conviction, and thus render that of the accomplice cumulative or superfluous, but it is evidence that tends to support that of the accomplice in the respect that 'it tends to con-connect the defendant with the commission of the offense'; in other words, the corroborative evidence must be such as fairly leads to the inference that the testimony of the accomplice implicating the defendant in the commission of the offense is true. Some substantial evidence of this sort is essential, but its extent or degree of probative force is for the jury. It is not necessary, as argued by plaintiffs in error, that the corroborative evidence of itself should be sufficient to prove the commission of the crime, or establish the defendant's guilt. To require that would be to render the evidence of the accomplice unnecessary and redundant. To corroborate means to strengthen; in this case, to make stronger the probative criminating force of the accomplice's testimony. His testimony alone is not self-supporting. It must be corroborated. Its credibility must be strengthened. The requirement of the statute is not that such corroborating testimony shall prove or establish the defendant's connection with the commission of the crime, but that it shall so 'tend.' The law is complied with if there is some other evidence fairly tending to connect the defendant with the commission of the crime, so that his conviction will not rest entirely upon the evidence of the accomplice."

Tested by this rule, there was a sufficiency of corroborating evidence. There was evidence, aside from Smith's, that, before the meeting at which the alleged agreement was made, word had been passed among the defendants that such a meeting was to be held. There was other evidence of the two lists of prices that were agreed upon at that meeting, and that said lists were used and sales made pursuant thereto. The manager of the independent company (Menzie) testified: That he had been invited by one of the defendants to attend said meeting. That he had been solicited by the defendants to come into the combination in regard to the matter of prices and also to agree upon the territory that should be supplied from the Geddes yards. This and other evidence and circumstances tending to corroborate the testimony of Smith was sufficient to warrant the jury in finding that

there was other evidence tending to connect the defendants with the commission of the offense.

[14] During the instructions to the jury, the trial court, in explaining the law, read section 4 of chapter 224, Laws of 1909, under which section the indictment was drawn, and also read the title to said chapter. This is assigned as error, and, in support thereof, appellants contend that the reading of the title necessarily conveyed to the jury the—

"impression that the tsatute was enacted for the express purpose of punishing these particular defendants, of regulating the retail lumber business, and that, if the acts of the defendants were within the broad purpose of the statute as expressed in its title, they ought to be convicted."

The statute was passed for the purpose of putting an end to the formation of the combinations and agreements therein proscribed and to punish *all* parties who should enter into such combination, regardless of the statute. It was necessary that the jury should know the law and understand the purpose thereof as expressed in the title, and we fail to see how the reading of either the statute or the title could leave any improper or unfair impression on the minds of the jury.

[15] Upon the question of reasonable doubt, the court charged the jury as follows:

"The reasonable doubt meant by this section (section 356, Code Cr. Proc.), which entitles an accused person to an acquittal, is a doubt of guilt reasonably arising from all of the evidence, facts, and circumstances in the case. The proof is deemed to be beyond a reasonable doubt when the evidence is sufficient to impress the judgment of ordinarily prudent men with a conviction on which they would act without hesitation in their own most important concerns and affairs of life. In other words, a reasonable doubt, within the meaning of our law, is a doubt which has some reason for its basis. It does not mean a mere possibility that might or could be suggested or imagined without a desire to arrive at the truth, or some mere groundless conjecture. A reasonable doubt, in short, is a doubt for which the jury are able to give or find a reason under all the evidence, facts, and circumstances in the case."

This instruction, appellants. contend, specified what was required to justify acquittal without specifying what was required to justify a conviction; that it was calculated to discredit the rule requiring proof of guilt beyound a reasonable doubt, and for that reason was unfair to appellants. With this contention we cannot agree. We believe the instruction was a fair and reasonable statement of what constitutes a "reasonable doubt," in criminal law.

The other instructions complained of have been examined, and, in our opinion, are free from error.

[16] At the close of the testimony for the prosecution, and again at the close of all the testimony, each appellant. separately, and on his own behalf, moved the court to advise a verdict of not guilty, on the ground that there was no evidence to connect him with the commission of the offense charged. After conviction, they made a motion in arrest of judgment, and also assigned insufficiency of the evidence to support the verdict. These matters have all been disposed of by our conclusions as to the relevancy and competency of the evidence. There was an abundance of evidence, if competent, to warrant the conviction of appellants, and, having already found that such evidence was competent, the question of sufficiency needs no further consideration.

[17] And, lastly, appellants contend that the judgment pronounced by the court is irregular and erroneous, if not void. This contention is based upon the fact that the judgment contains a recital showing the amount of expense that had been incurred by the county in the prosecution of this case. Of course, this is matter that has no proper place in the judgment. While it is proper for the court, in fixing the amount of the fine, to take into consideration the cost of the prosecution, it is not at all necessary to put the amount of the various items into the judgment. But, while this is true, the insertion of such amounts in the judgment by no means renders such judgment void, nor in any manner injures the appellants.

No prejudicial error appearing in the record, the judgment and order appealed from are affirmed.

SMITH, J., not sitting.